336 So.2d 849 (1976)
GULF COAST PRE-MIX TRUCKING, INC., et al.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 57500.
Supreme Court of Louisiana.
June 21, 1976.
Rehearing Denied September 10, 1976.
*850 Harold R. Ainsworth, New Orleans, for plaintiffs-appellants.
Marshall B. Brinkley, Gen. Counsel, Thomas K. Kirkpatrick, Dozier, Keyser & Kirkpatrick, Baton Rouge, for defendant-appellee.
SUMMERS, Justice.
Rome Truck Lines, Inc., applied to the Public Service Commission for a certificate of public convenience and necessity and for authorization to operate a common carrier motor freight service transporting "all liquids pertaining to the drilling, bringing in, cleaning out and working over of oil wells and gas wells, including salt water and fresh water, in tank trucks, but excepting acids and fuel for combustion purposes" over "irregular routes from, to and between all points within the State of Louisiana."
Vacuum Truck Carriers of Louisiana, Inc., and its member carriers, Younger Brothers, Inc., and Groendyke Transport, Inc., filed protests. The matter was heard before the Commission on March 18, 1975, and on June 16, 1975, the Commissioner issued its order granting the certificate applied for, except that the territory was limited to that part of the State south of a line drawn east and west through the city of Alexandria. One of the three commissioners dissented.
When a rehearing was denied by the Commission by a two-to-one vote, Gulf Coast Pre-Mix Trucking, Inc., Prudhomme Truck Tank Service, Inc., Garret Oil Field Service, Inc., Vacuum Tank Service of Vidalia, Inc., B & M Trucking, Inc., and Vacuum Truck Carriers of Louisiana, Inc., all Louisiana corporations, filed suit in the Nineteenth Judicial District Court to set aside and nullify the Commission's order, alleging that the order of the Commission was erroneous for the following reasons:
1. Applicant failed to prove that the public convenience and necessity would be materially promoted as required by Section 164 of Title 45 of the Revised Statutes.
2. Applicant only attempted to show a need from Houma, yet a vast territory was awarded.
3. Applicant's witnesses proved that the present service from Houma is adequate and no additional service is needed even from this point of origin.
4. Applicant only attempted to show a need to transport one commodity, yet all of the commodities requested by applicant were authorized.

*851 5. The order is contrary to the law and the evidence at the hearing.
6. The evidence at the hearing established that there is ample and adequate service available and no additional service is required.
A general denial was filed by the Commission, and Rome Truck Lines, Inc., intervened in the suit in support of the Commission's order. By agreement the matter was submitted on the pleadings and the record formed at the hearing before the Commission.
While expressing "some reservations as to the necessity of another motor carrier to transport these commodities" the trial judge affirmed the Commission order; whereupon plaintiffs appealed to this Court.
Applicant, Rome Truck Lines, Inc., presented three witnesses in support of its application. Daniel J. Rome, Sr., testified that he was an oil field consultant on the drilling, completion and production of oil wells. He said that the company was recently formed by him and that he had filed proper evidence with the Commission to demonstrate the requisite financial responsibility. If the application were granted, he would run the company, and he intended to purchase 16 trucks, 14 vacuum tanks and 2 others, for use in the business.
On cross-examination he asserted that he felt there was a need for the business, because in his occupation as a consultant there were times when it was necessary to wait "quite a bit" on trucks. Nevertheless, he was not prepared to give details or present records of these delays, and he relied upon his other witnesses to supply the data. He conceded also that he had never tried to use existing carriers for transportation of petroleum products and had no authority, as a consultant, to designate the bulk petroleum carrier.
Wayne Bollinger, assistant operations manager of Delta Mud and Chemical Company of Houma, is involved in the daily operations of his company trucking drilling mud, calcium chloride and salt water. In this capacity he engages the trucks for deliveries. When Prudhomme and Gulf Coast Pre-Mix do not have trucks available, he said, they inform the company ordering the drilling mud that there will be a delay in the delivery, because to call an out of town truck merely would entail further delay without significantly alleviating the situation at the well. He kept a log of delays due to unavailability of trucks. There were about five or six instances entered in the log of delays during a five-month period involving approximately 400 shipments. Except for one, the delays involved less than six hours. The log was not represented to be entirely accurate, the intimation being that there were other delays.
Time is particularly important when certain types of muds are required at the drilling site, for these certain types are used to dislodge drill pipe. Stuck drill pipe is a threat to the well and can result in a fishing operation or a blowout and heavy expense. Otherwise, delays in delivery of other type muds used in routine drilling operations pose no unusual threat to the well. Less heavy expense in the drilling operation is sometimes involved in these latter instances, however, for the crew and equipment are mostly idle during the delay.
Max Patterson appeared at the hearing in support of the application to represent Louisiana Mud Company, which also handles liquid mud products. He was of the opinion that the addition of Rome Truck Lines, Inc., to the available truck lines at Houma would make delivery of his product easier and would help the customers "at times". He kept no logs of delays due to truck shortages but indicated delays did occur. He had no recollection, however, of specific instances.
Larry Brown who appeared on behalf of Groendyke testified in direct presentation that Groendyke was protesting this application because if the application as originally *852 submitted was granted certain wording would possibly authorize the transportation of petroleum products, one of the principal commodities transported by Groendyke. It would also authorize the transportation of salt water and fresh water, which Groendyke is presently authorized to transport anywhere in the State in bulk. The wording to which Brown pointed to support his apprehension is: "The transportation of all liquids pertaining to the drilling, bringing in and cleaning and working over of oil wells and gas wells." Rome supported this fear of Groendyke's by testifying that he did in fact intend to transport petroleum products in two of the tank trucks which he intends to purchase.
It is also clear, however, that Groendyke would have no standing to protest certain other portions of the commodity description in the application which would authorize the applicant to transport "liquid mud, chemical acids in bulk in tank trucks" used in the drilling, bringing in or cleaning out of oil wells because the operating authority of Groendyke specifically prohibits the transportation of these commodities while transportation of salt water and fresh water by Groendyke is not prohibited or restricted.
In support of the authority which it sought to transport petroleum products, salt water and fresh water, the only evidence adduced by the applicant was the testimony of Rome, who made the self-serving, unsupported declaration that he intended to transport these two commodities. Rome's witnesses, Bollinger and Patterson, testified that they had no need for any transportation of petroleum products. Although Bollinger testified to a need for the transportation of salt water and fresh water, he expressed no dissatisfaction with the service offered by existing carriers transporting these commodities. There was, therefore, no evidence on which the Commission could support a grant of any authority to Rome Truck Lines, Inc., authorizing it to transport these two commodities. Groendyke asks that if authorization is granted it specifically exclude the transportation of petroleum products in bulk, salt water and fresh water.
Wray E. Hughes appeared on behalf of the protester Younger Brothers, Inc. That company is authorized to engage in intrastate trucking in Louisiana transporting petroleum products and liquid commodities, including salt and fresh water but not including muratic acid and liquid mud. Terminals are maintained in Lake Charles and Baton Rouge. Its Houma terminal had been discontinued for lack of business. According to this witness his company has experienced a loss of business requiring that 30 to 35 drivers, clerical people, shop and service employees be laid off.
John Garrett, with Garrett Oil Field Service of Haynesville, operates in North Louisiana transporting fresh water, salt water, oil field waste, and occasionally, liquid mud. He testified that orders for liquid mud are generally anticipated about twelve hours in advance and that emergencies cannot be anticipated. When these occur any delivery is late, no matter how prompt. His equipment, he said, was often idle, and additional competition was not needed because he could handle more business.
Mary Williams, with Vacuum Tank Service of Vidalia, testified that her company is taking care of the needs of the shipping public, and two of her company's trucks were presently idle. At this time there is not much drilling activity in her area. Additional competition would be harmful to her business, according to her testimony.
Edward M. McLandrich is president of B & M Trucking, Inc. of Lafayette. From its Lafayette terminal that company is actively transporting commodities for which applicant is seeking authority. He knows of no need for additional trucking facilities and declares that additional competition would be harmful to his company.
*853 The branch manager of Browning-Ferris Electric Service, Walter Elkins, testified his company has terminals in Lake Charles, Monroe and Baton Rouge with 21 vacuum trucks available to locate where needed. Although they presently serve the southwest part of the State, equipment is available to serve where the need arises.
Elkins said mud which is ordered must frequently be conditioned with "baryte" to specific weights and that this causes delays. He verified previous testimony that the company conducting the drilling operation usually anticipates its need for mud and places the order in ample time (sometimes the previous day) to permit delivery when the need arises. When emergencies occur the delivery is made as quickly as possible, but under these conditions any delay, however short, is late. He joined the other certificated carriers in the lament that additional competition would be harmful to his business.
Prudhomme Tank Truck Service, Inc. of Lafayette was represented by its general manager, Wilbur J. Ducharme. This company has 20 units, 9 in Houma and 11 in Lafayette, in addition to transports at both locations to haul petroleum products. The company is active in the transportation of commodities involved in Rome's application and is in a position to purchase more equipment if needed. If the demand for equipment in Houma justifies the move, units from the Lafayette terminal can be transferred within four hours. This transfer involves no additional cost to the customer, for under these circumstances tariffs require billing from the Houma terminal if the commodity is delivered from that territory.
Normally they are able to provide a truck at the loading point within an hour. Emergencies occur but they are not frequent. If all units are in use and an emergency arises, Prudhomme calls its competitors to provide the needed trucks. Ducharme had no knowledge that any serious problem involving service in the Houma area had ever been presented. Emergency situations had only arisen twice during the month and generally represent about two percent of the company's revenue from both terminals.
Robert Hollier, the assistant general manager of Gulf Coast Pre-Mix Trucking, testified that the company has terminals in Lafayette and Abbeville employing 36 vacuum trucks, 12 in Houma and 24 in Abbeville. The company is meeting all public needs for its services. In all liquid mud situations the driller usually knows 36 hours in advance when they are going to have a "changeover". Normally the trucker is notified a night in advance of the needed shipment. In emergency situations, however, no advance notice is given. In those cases when no equipment is available, units are pulled off a routine job. The use of the special type mud required in emergency situations where pipe is struck usually requires only one or two trucks, and in 95% of the cases trucks will be available. Coordination between the mud companies and the haulers avoids other complications in emergency situations.
Transfer of units to Houma from Abbeville is accomplished when the need arises and imposes no additional charge on the customer, the charge being from the point where the mud is loaded. Gulf Coast is open 24 hours a day, 7 days a week, and has lots of competition. All public needs for the company's service are met.
Hollier explained Bollinger's and Patterson's testimony as follows:
"I understand that there were only five instances that only one of the two could point out and substantiate that they were late getting equipment. In all probability, in these particular instances it was not an emergency condition and it *854 wasn't emphasized. Otherwise units would have been pulled off another job."
The law applicable to this case requires a consideration of Section 164 of Title 45 of the Revised Statutes, which reads as follows:
"No motor carrier shall operate as a common carrier without first having obtained from the commission a certificate of public convenience and necessity, which shall be issued only after a written application made and filed, a public hearing, due notice given to applicant and all competing common carriers, and a finding by the commission that public convenience and necessity require the issurance of a certificate. No new or additional certificate shall be granted over a route where there is an existing certificate, unless it be clearly shown that the public convenience and necessity would be materially promoted thereby.
"No motor carrier shall operate as a contract carrier without having had a public hearing and obtained from the commission a permit to do so, which permit shall not be issued unless in the public interest and until the applicant shall have complied with the requirements of R.S. 45:161 through R.S. 45:172."
This statute imposes a high degree of proof on an applicant to show public convenience and necessity over a route where an existing carrier is already operating and serving the public. A clear showing is required that the public convenience and necessity would be materially promoted by the proposed service. Herrin Transportation Co. v. Louisiana Public Service Commission, 261 La. 977, 261 So.2d 635 (1972); Bulk Transport, Inc. v. Louisiana Public Service Commission, 252 La. 9, 209 So.2d 4 (1968); Hearin Tank Lines, Inc. v. Louisiana Public Service Commission, 247 La. 826, 174 So.2d 644 (1965); Herrin Transportation Co. v. Louisiana Public Service Commission, 241 La. 174, 127 So.2d 541 (1961); Texas and New Orleans Railroad Company v. Louisiana Public Service Commission, 235 La. 973, 106 So.2d 438 (1958).
In the hearing to support this application the applicant has failed to make any showing that the public convenience and necessity would be materially promoted by allowing another motor carrier to transport petroleum products and salt and fresh water in bulk in any geographical area of the State. The showing was limited to one geographical area around the city of Houma with no showing whatsoever being made for any need of additional transportation facilities for any commodities in any other part of the State. To the contrary, the showing is limited to the needdemonstrated by five instancesfor a prompt delivery of a certain type of mud needed during infrequent emergencies. Even these instances do not support a finding of delays detrimental to the public convenience and necessity.
No showing whatsoever is made insofar as the other commodities covered by the application: "all liquids pertaining to the drilling [except the special mud required to dislodge stuck drill pipe], bringing in, cleaning out and working over of oil wells and gas wells, including salt water and fresh water, in tank trucks." Yet the certificate was granted to permit operations in the entire area of the State south of the city of Alexandria, and all commodities covered by the application were approved.
With respect to the five instances where delays in delivery are claimed, there is no showing that these delays resulted in damage or inconvenience to anyone. Although we may assume from the testimony that damage or inconvenience did occur, the inference is also plausible that these emergency situations necessarily involve a certain amount of damage or inconvenience which is, as a practical matter, unavoidable.
*855 In these circumstances the major requirement is that the applicant demonstrate that his proposal is responsive to public demand left unsatisfied by existing authorized carriers. This is customarily and as a matter of practice accomplished through public shipper testimony establishing facts which meet this burden of proof. Generalities do not suffice.
Against the showing of the applicant, the record contains the evidence and protests of all the carriers to which reference has been made in this opinion. They are well equipped and assert they are capable of providing the service which applicant proposes without inconvenience to the public. There is no satisfactory showing to the contrary.
Existing carriers have the right to transport all the traffic that they can handle adequately, efficiently, and economically in the territories they serve without the added competition of a new operation. The public is ultimately the loser as the result of unnecessary duplication of utility or transportation facilities. Reduction in income and revenues of existing carriers causes the inevitable reduction of services and schedules. Herrin Transportation Co. v. Louisiana Public Service Commission, 241 La. 174, 127 So.2d 541 (1961).
This opinion involves a detailed reference to the evidence because of the Court's reluctance to overturn the findings of the Commission. But in this instance the dissent of one commissioner and the "reservations" expressed by the trial judge are well-founded. We are convinced, therefore, that the record cannot reasonably support the certification of applicant.
For the reasons assigned, the judgment appealed from is reversed and the order of the Commission is annulled and set aside.