540 So.2d 275 (1989)
CTS ENTERPRISES, INC.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 88-CA-2061.
Supreme Court of Louisiana.
March 13, 1989.
*276 Robert L. Rieger, Jr., Baton Rouge, for defendant-appellant.
V. James Stewart, William C. Shockey, Shockey & Ziober, Baton Rouge, for plaintiff-appellee.
Kenneth W. Campbell, Ruston, for intervenor-appellee.
CALOGERO, Justice.
The appeals of the Louisiana Public Service Commission and REB Transport, Inc. in this case and the appeal of CTS Enterprises, Inc. in a companion case (No. 88-CA-2374) involve similar motor contract carrier permit applications. The cases were appealed, argued and briefed separately, and not formally consolidated. Because the subject matter is identical, the cases involve similar contract carrier permit applications (one by REB, the other by Daniel Grafton Murphy), a common support shipper (Louisiana Laminates, Inc.) and an identical opponent, (CTS Enterprises, Inc.) we resolve the legal issues for both cases in this opinion, while rendering separate opinions this day.
This case involves a contract carrier permit application by REB Transport, Inc. The other, an application by Daniel Grafton Murphy, is treated in the companion opinion, CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 285 (La.1989) (Daniel Grafton Murphy, d/b/a Grafton Crossing Trucking, intervenor) No. 88-CA-2374, (decided March 13, 1989).
REB Transport, Inc., an interstate motor carrier, applied to the Louisiana Public Service Commission for a contract carrier permit to operate as an intrastate contract motor carrier, transporting general commodities throughout the state for five unnamed shippers. Upon receiving notice of *277 opposition from a number of motor carriers, REB restrictively amended its application, thereby limiting its request to the transportation of building materials, lumber and wood products throughout the state. Thereafter, plaintiff CTS Enterprises, Inc. persisted in its opposition to REB's application. After a public hearing, the Public Service Commission granted REB a contract carrier permit, finding that "the authority as restrictively amended would be in the public interest". Louisiana Public Service Commission Order No. T-17575, October 21, 1987.
CTS Enterprises, Inc. appealed that decision to the district court in East Baton Rouge Parish. Honorable Carl Guidry, Judge of Division K of that Court, rescinded the Louisiana Public Service Commission's order. He also cancelled and revoked the contract carrier permit issued to REB Transport, Inc., finding essentially that the Commission lacked a reasonable basis for granting the permit. The judge found the evidence lacking in facts upon which the Public Service Commission could reasonably have concluded that the issuance of the permit was in the public interest.[1] REB Transport, Inc. and the Louisiana Public Service Commission appealed to this Court, protesting the district court's rescission of the Public Service Commission order and revocation of the contract carrier permit. Appellants argue that the district court committed error of law by substituting its judgment for that of the Public Service Commission, when the Commission's finding was reasonable and supported by the evidence in the record.
Before we address sufficiency of the evidence in support of the Commission's granting the contract carrier permit, we believe that it is appropriate to discuss the legal principals governing the authority of the Louisiana Public Service Commission and its granting of contract motor carrier permits. Although there are numerous cases decided by this Court involving common carrier applications, some granted, and some denied by the Commission [e.g., see M & G Fleet Service, Inc. v. Louisiana Public Service Commission, 443 So.2d 574 (La.1983); Florane v. Louisiana Public Service Commission, 433 So.2d 120 (La. 1983); Dreher Contracting & Equipment Rental, Inc. v. Louisiana Public Service Commission, 396 So.2d 1265 (La.1981); Truck Service, Inc. v. Louisiana Public Service Commission, 263 La. 588, 268 So. 2d 666 (1972); Saia Motor Freight Line, Inc. et al v. Louisiana Public Service Commission, 243 La. 787, 147 So.2d 390 (1962) ], there is only one case in our jurisprudence involving a contract carrier permit applicant, Southern Sugar Transport, Inc. v. Louisiana Public Service Commission, 324 So.2d 435 (La.1975). In Southern Sugar, this Court affirmed the Public Service Commission's issuance of a contract carrier permit, finding that some evidence existed which supported the Commission's order, that the Commission's order was not arbitrary and capricious, and that the issuance of the permit was "in the public interest." Southern Sugar, supra at 437, 438.
The "some evidence" and "arbitrary and capricious" standards recited in Southern Sugar were drawn from decisions of this Court delineating the scope of judicial review of orders granting common carrier certificates of public convenience and necessity. In fact we stated in Southern Sugar that those decisions are applicable to the review of orders granting or refusing contract carrier permits. Southern Sugar, supra at p. 437 (citing, Herrin Tank Lines, Inc. v. Louisiana Public Service Commission, 247 La. 826, 174 So.2d 644 (1965) and Truck Service, Inc. v. LPSC, 263 La. 588, 268 So.2d 666 (1972)).
Our latest expression on the standard of review (in a common carrier setting) is found in Miller Transporters, Inc. v. Public Service Commission, 518 So.2d 1018 (La.1988) wherein we said "Upon judicial review of the Commission's determination of whether the applicant has made such a showing [i.e. that the public convenience *278 and necessity would be materially promoted by issuance of a certificate], a court will not upset the agency's finding unless it is based on an error of law or is one which the Commission could not have found reasonably from the evidence." 518 So.2d 1018 at 1020. This is the standard which we will apply in this case.
Furthermore, that sole contract carrier case in our jurisprudence, Southern Sugar Transport, Inc. v. Louisiana Public Service Commission, supra, did not fully discuss the considerations which the Louisiana Public Service Commission should take into account in determining whether a given contract carrier permit should or should not be granted to an applicant. For the latter reason we discuss here those considerations.
Louisiana's 1938 Motor Carrier Act (Act 301 of 1938)[2] parallels the U.S. Congress' Motor Carrier Act of 1935 (49 U.S.C. §§ 301 et seq.). It regulates motor carriers by requiring the issuance of motor carrier permits and the imposition of rates and tariffs. The Louisiana statute declares that the business of operating motor vehicles for hire as common or contract carriers of persons or property for compensation upon the public highways and bridges of this state is a business affected with a public interest. La.R.S. 45:161.[3] It divides regulated motor carriers into two classes, common and contract. In Louisiana, a "common carrier by motor vehicle" is defined essentially as a person in the business of transporting persons or property for compensation and available to the public generally, whereas "contract carrier by motor vehicle" is any person not a common carrier who transports passengers or property by vehicle for compensation under special and individual contracts or agreements. La.R.S. 45:162(4), (5).[4]
*279 Barriers to entry for both common and contract carriers are established through the Public Service Commission's exercise of its power to limit the number of carriers issued motor carrier authority. La.R.S. 45:164 establishes the requirements for the issuance of new or additional motor carrier authority:
No motor carrier shall operate as a common carrier without first having obtained from the commission a certificate of public convenience and necessity, which shall be issued only after a written application made and filed, a public hearing, due notice given to applicant and all competing common carriers, and a finding by the commission that public convenience and necessity require the issuance of a certificate. No new or additional certificate shall be granted over a route where there is an existing certificate, unless it clearly be shown that the public convenience and necessity would be materially promoted thereby.
No motor carrier shall operate as a contract carrier without having had a public hearing and obtained from the commission a permit to do so, which permit shall not be issued unless in the public interest and until the applicant shall have complied with the requirements of R.S. 45:161 through R.S. 45:172. (emphasis provided)
Thus, the issuance of common carrier authority is governed by "the public convenience and necessity" (Saia Motor Freight Line, Inc. v. Louisiana Public Service Commission, supra; Truck Service, Inc. v. Louisiana Public Service Commission, supra), whereas the issuance of contract carrier authority must simply be "in the public interest". Southern Sugar Transport, Inc. v. Louisiana Public Service Commission, supra. Just what constitutes the public interest is not made clear by either Louisiana's statutes or jurisprudence.
The Interstate Commerce Commission, under the Motor Carrier Act of 1935 (Title 49 U.S.C., Ch. 8 Interstate Commerce Act, Part II, Motor Carriers, Sections 301-327), also regulates the motor carrier industry primarily through the imposition of rates and tariffs, and the creation of barriers to industry entry and exit.[5] Motor carrier entry is controlled by the issuance of motor carrier authority, such authority being required for the operation of any motor carrier business offered to the public. 49 U.S.C. § 303(c) The Motor Carrier Act divides motor carriers into three groups; motor common carriers, motor contract carriers, and private carriers.[6]
*280 Federal common carrier authority is granted when the applicant demonstrates, under the provisions of § 307 of Title 49, that the proposed operation is or will be required by the present or future public convenience and necessity, the same standard as imposed under the Louisiana statute. So, too, federal contract carrier authority is issued upon a showing that issuance of the proposed authority will be consistent with the public interest and national transportation policy (and a showing that the operation satisfies the definitional criteria of a contract carrier). 49 U.S.C. § 309(b).
Thus, both the federal and Louisiana statutes require a showing of public convenience and necessity by the common carrier applicant and the counterpart showing, "in the public interest," for a contract carrier applicant.[7]
There is ample Louisiana jurisprudence concerning the principles which apply to the granting of common carriers certificates of public convenience and necessity.[8] The foremost criteria considered in the issuance of carrier authority is the need of shippers for carrier service. Saia Motor Freight Line, Inc. et al. v. Louisiana Public Service Commission, 243 La. 787, 147 So.2d 390 (1962); Gulf Coast Pre-Mix Trucking, Inc. et al v. Louisiana Public Service Commission, 336 So.2d 849, 855 (La.1976); M & G Fleet Service, Inc. v. Louisiana Public Service Commission, 443 So.2d 574 (La.1983). Where there is a demand for additional service arising from an increase in industrial activity or a determinable increase in future demand, the requested authority is usually granted. M & G Fleet Service, Inc., supra at 576; Scotty's Vacuum Service, Inc. v. Louisiana Public Service Commission, 450 So.2d 1303 (La.1984).
The need for additional carrier service is directly related to the adequacy of existing carriers. Truck Service, Inc., supra; M & G Fleet Service, Inc., supra at 580. When an existing carrier is incapable of handling a specific type of shipping need, the service of such carrier is said to be deficient. Truck Service, Inc., supra. However, where the existing carriers are adequately equipped and capable of providing the service, the existing carriers have the right to transport all the traffic they can handle without the added competition of a new operation. Gulf Coast Pre-Mix Trucking, supra, at 855.
This Court has also recognized that the special needs of a particular shipper and the special capacity or expertise of a particular carrier are considerations to be taken into account in determining whether the issuance of a certificate is made necessary by the public convenience and necessity. Ken-Go Services, Inc. v. Louisiana Public Service Commission, 483 So.2d 141, 144 (La.1986).
With respect to the burden of proof, it is on the applicant. This is so as to both the contract carrier (Southern Sugar Transp., Inc. v. LPSC, supra) and the common carrier (Gulf Coast Pre-Mix Trucking, Inc., et al v. LPSC, 336 So.2d 849 (La.1976); Truck Service, Inc. v. LPSC, 263 La. 588, 268 So.2d 666 (1972).
General, conclusory, and self-serving statements are insufficient to prove that the public convenience and necessity requires additional service. Saia *281 Motor Freight Line, Inc., supra; Gulf Coast Pre-Mix Trucking, Inc., supra, at 855. Allegations of carrier service failure must be proven by facts, specific instances where the shipper was unable to transport its commodity due to inadequate service. Louisiana Tank, et al v. Louisiana Public Service Commission, 442 So.2d 1124, at 1129 (La.1983). Nor is the fact that the carrier applicant will provide excellent service adequate to prove that the public convenience and necessity will be materially promoted. Scotty's Vacuum Service, Inc., supra at 1304.
These considerations were synthesized in this Court's most recent opinion regarding the issuance of common carrier authority, Miller Transporters, Inc. v. Louisiana Public Service Commission, 518 So.2d 1018, 1019-20 (La.1988). In Miller, we stated:
The convenience and necessity required is that of the entire public affected by the new or additional certificate, as distinguished from that of an individual or any number of individuals [citing authorities]. To be a "public necessity" the new motor carrier service does not have to be absolutely indispensable, but it must provide such an improvement of the existing transportation service as to warrant the cost of making the improvement [citing authorities]. Among the factors which may be considered in determining public convenience and necessity are whether the new operation or service will serve a useful public purpose, responsive to public demand or need, whether this purpose can and will be served as well be existing carriers, whether it can be served by the applicant without endangering or impairing operations of existing carriers contrary to the public interest, and whether it can be served by the applicant without undue jeapordy to highway users or to the structure and safety of the roads [citing authorities].
Miller Transporters, at 1019. Indeed Miller not only synthesized the prior jurisprudence, but also gave us a balancing test to apply in these cases ("the new service" must provide such an improvement of the existing transportation service as to warrant the cost of making the improvement), as well as criteria to be considered in any determination regarding the issuance of common carrier certificates.[9]
*282 It is only with regard to the contract carrier authority that Louisiana's jurisprudence is sparse. We must nonetheless determine for disposition of this case just what regulatory principles are applicable regarding the contract motor carrier applicant.
Absent explanation in Louisiana's statutes and/or regulations concerning the contract carrier's controlling principle, "in the public interest," we find it informative to review federal authorities in this area.
For the contract motor carrier the federal standards for the issuance of a permit were set out at 49 U.S.C. § 309(b), which stated, in pertinent part:
... the Interstate Commerce Commission shall issue a permit ... as a motor contract carrier ... if the Commission finds that the applicant is fit, willing, and able to perform the service of a contract carrier ... and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in this Act ... In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider [1] the number of shippers to be served by the applicant, [2] the nature of the service proposed, [3] the effect which granting the permit would have upon the services of the protesting carriers and [4] the effect which denying the permit would have upon the applicant and/or its shipper and [5] the changing character of that shipper's requirements.[10]
Under this section of the Act, the strength of an applicant's case depends in part upon "[1] the number of shippers to be served by the applicant." The larger the number of shippers a carrier proposes to serve, the greater the carrier's impact on the economic equilibrium of the industry, and the less acceptable will be its showing under this criterion. See, Claycon Transp. Corp. Extension-Clay, 117 M.C.C. 93 (1972).
As to the second criteria of Sec. 309(b) for determining whether issuance will be consistent with the public interest and the national transportation policy, i.e., "the nature of the service proposed," the United States Supreme Court in I.C.C. v. J.T. Transport, 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), concluded that consideration must be given to the specialized transportation requirements of the supporting shipper, the manner in which the applicant proposes to satisfy them, and whether they may be satisfied equally as well by the protestant.
The Supreme Court in J.T. Transport, supra, also shed light on the third and fourth criteria of § 309(b) (effect of grant upon protesting carriers and effect of denial *283 upon applicant and/or its shipper). The Court stated:
The adequacy of existing services is a criterion to be considered by the Commission, as it is instructed to consider "the effect which granting the permit would have upon the services of the protesting carriers," as well as the effect of a denial upon the shippers. Or to put the matter otherwise, the question of the need of the shipping public for the proposed service necessarily includes the question whether the extent, nature, character, and suitability of existing, available service makes the proposed service out of line with the requirements of the national transportation policy ... The "distinct need" of shippers for the new contract must be weighed against the adequacy of existing service.
The final criteria ("[5] the changing character of that shipper's requirements") is normally not at issue in determining whether the issuance of a permit is consistent with the national transportation policy and the public interest. Dempsey, Paul "Entry Control Under the Interstate Commerce Act: A Comparative Analysis of the Statutory Criteria Governing Entry in Transportation", 13 Wake Forest Law Review 729, at 757-8 (1977).
What can be gleaned from review of the Federal and State jurisprudence on common carrier authority and the Federal regulations and jurisprudence on contract carrier authority is that the standards for common and contract authority are similar. Each requires consideration (and weighing) of the effect granting a permit will have on existing common and contract carriers, the effect denying a permit will have on the shippers and the applicant, with due regard to the number of affected shippers, the nature of the service proposed and the changing character of shipper requirements. The difference is that the required showing by the contract carrier applicant is less stringent, primarily for the reason that the contract carrier has less effect upon the equilibrium of the market place. The contract carrier authority is more limited in nature, restricted to specific commodities, specific shippers and designed to meet the special needs of the shipping public. This difference is reflected, if not established, by the different statutory requirements. Common carrier applicants must show that the public convenience and necessity requires the issuance of a certificate (R.S. 45:164, 1st. paragraph), while contract carrier applicants need only show that issuance of a permit is "in the public interest" (R.S. 45:164, second paragraph).
We conclude, therefore, that in determining whether the contract carrier permit is "in the public interest," the Public Service Commission should, with less exacting scrutiny, give consideration to the same factors to be found in the jurisprudence regarding the common carrier applicant, including the effect of the grant of carrier authority on existing carriers, shippers and road users. They should also specifically consider the number of shippers to be served by the applicant, the nature of the service proposed, the effect which granting the permit would have upon the services of the protesting carrier, the effect which denying the permit would have upon the applicant and/or its shippers, and the changing character of the shippers' requirements.
Consistent with these principles, and cognizant that the burden is on the applicant, we examine the case before us to determine whether the Commission, acting reasonably on the evidence before them, could have determined that issuing REB a contract carrier permit was in the public interest; and, correspondingly, whether the district judge erred when he determined that the Commission did not so act.
REB Transport, Inc. has an Interstate Commerce Commission certificate which permits it to transport cargo between points in Louisiana and other states. REB has no intrastate authority. In this application, REB seeks to secure authority to transport wood products intrastate.
In support of its application, REB offered testimony attempting to prove that such authority is in the public interest because of their own capability to provide the needed additional service, and the inadequacy *284 of service provided by existing carriers. No evidence was adduced at the hearing, nor did REB argue in its briefs, that REB's services were designed to meet a special need of its shippers or the changing character of the shippers' requirements. Thus, the pertinent considerations here are the adequacy of existing carriers, the number of shippers to be served, the nature of the services proposed, the effect of a grant of REB's permit upon not only the protesting carrier, CTS, but also upon existing common and contract carriers, and the effect of denying REB's permit upon REB and its shippers. And, more pertinently, the question is whether REB proved and the Commission reasonably concluded that on the evidence, and weighing the appropriate considerations, issuance of the sought contract carrier permit was in the public interest.
Troy Biscomb, president of REB Transport, Inc., testified on behalf of REB that REB currently dispatches eighteen tractor-trailer flatbeds, a flatbed being the type of trailer required for the transportation of wood products. The shipper witnesses testified that currently they transport between thirty and forty-one loads per week. These loads are to be transported between the manufacturer of the commodity, wholesalers and retail outlets. Thus, the scope of the transportation service will encompass all levels of the distribution chain and entail operations throughout the state. That authority potentially impacts not only the protestant, CTS, and the other carriers who operate in the area, but carriers throughout the state.
As did the district court judge, we have examined the record made up before the Public Service Commission, and we conclude that even with the lesser standard applicable to the contract carrier applicant, REB did not sustain their burden of proving that issuance to them of the contract carrier permit is in the public interest.
In addition to presenting no case or even argument that REB's services were designed to meet a special need of its shippers, nor so much as an argument regarding changing needs of the shipper public, REB failed to make a plausible case regarding the factors which were addressed at the hearing.
At this juncture, we note that the authority sought is to service five unnamed shippers, the maximum number of shippers allowed by law, and to transport commodities for these shippers over irregular routes throughout the state of Louisiana. As previously discussed, the greater the number of shippers to be served by the applicant, the higher the applicant's burden of proving that the permit is in the public interest. Claycon Transp. Corp. Extension-Clay, supra.
There was no showing that existing carriers were inadequate, only that the five shipper witnesses were desirous of having this additional carrier authority issued. Shipper preference alone is not a consideration in the issuance of authority. H.H. Follmer Contract Hauling, Inc., 82 M.C. C. 18. The five shipper witnesses who appeared in support of REB's application all claimed they need REB's services and that the existing carriers provided inadequate service to their businesses. However, as previously discussed, these general, self-serving statements are insufficient to establish the fact that the existing carriers are inadequate.[11] In fact there is indication in the record that the following motor carriers were available to service the shippers: Buffington Corporation, Littleton Truck Lines, W.C. Littleton, JKC, Inc., Melton Truck Lines, Liggin Nationwide, Delta Southern Transport, Southern Gulf Transport, Vernon Sawyer, and Greer and Kennedy. In addition, at no time did any of the witnesses inquire of the Public Service Commission or otherwise to learn of the existence of the available carriers.
No evidence was introduced pertaining to a distinctive characteristic that REB Transport, Inc. possesses which separates itself from the existing authorized carriers. *285 Thus, the type of service to be rendered by REB to the shippers is not a factor favoring applicant.
Nor did applicant present evidence that his entry into the intrastate business of transporting wood products statewide would not adversely affect existing contract and common carriers. On the other hand the president of CTS Enterprises, Inc., Kevin Crume, testified that his company and other authorized carriers currently have idle equipment, largely because the economy in the state is suffering.
We conclude, therefore, that the district court was correct in rejecting the Commission's grant of a motor contract carrier permit to REB, and that the Commission did not act reasonably on the evidence in concluding that issuance of the REB permit was in the public interest, even considering that the required showing by a contract carrier applicant is less stringent than that required of a common carrier applicant.

DECREE
For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.
NOTES
[1] The parties introduced at trial a transcript of the testimony before the Public Service Commission. No additional evidence was taken.
[2] The 1938 Louisiana Motor Carrier Act is currently incorporated variously within R.S. 45:161 200.17. It directs the Louisiana Public Service Commission to regulate all facets of Louisiana's intrastate trucking industry. Acts 1938, No. 301.
[3] La.R.S. 45:161, Declaration of Policy, states:

The business of operating (for hire) motor vehicles as common or contract carriers of persons or property for compensation upon the public highways and bridges of this state is a business affected with a public interest.
The traffic over and condition of the highway system of the state render it imperative that uniform, reasonable, and just regulation of this business be employed to conserve the interest of the general public, protect the public highways from undue wear, minimize the inconvenience to other highway users, safeguard the needs of the public for adequate motor transportation, prevent irresponsible operation detrimental to the general welfare, minimize congestion on the highway, adjust, correlate and coordinate the various transportation agencies using the highways so the public will be given the benefit of the most economic and efficient means of transportation without discrimination against legitimate forms of transportation, and foster sound economic conditions among all classes of carriers.
Correspondingly, the Interstate Commerce Act Congress declared the following National Transportation policy (outset to Chapter 1 of Title 49, 49 U.S.C. § 301):
... to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices; ... all to the end of developing, coordinating and preserving a national transportation system ... adequate to meet the needs of the commerce of the United States.
[4] La.R.S. 45:162(4) and (5) provide, in full:

(4) "Common carrier by motor vehicle" means any person, the essential nature of whose business comprises engaging in, soliciting or accepting persons or property for transportation for hire, charge, or compensation as an employment or holding himself out as so available to the public generally and indiscriminately for such business, whether or not the business is conducted over a regular route, between fixed termini, within a defined area, or upon a regular or irregular schedule. There shall be two main classes of common carriers, "common carriers of commodities over regular routes", and "common carriers of special commodities over irregular routes". "Common carriers of special commodities over irregular routes" means any person, as a common carrier, transporting commodities which require special equipment, service or handling over irregular routes and not between fixed termini....
(5) "Contract carrier by motor vehicle" means any person not included under the preceding paragraph of this section, who under special and individual contracts or agreements, and whether directly or by other arrangement, transports passengers or property by vehicle for compensation or hire, where in the course of the transportation a highway between two or more incorporated municipalities is traversed.
[5] Prior to the 1935 Motor Carrier Act (Part II of the Interstate Commerce Act), we are told that conditions in the motor carrier industry were chaotic. Entrance into the industry depended solely on the ability to raise enough capital for a downpayment on a truck. Consequently, many carriers owned only one or two trucks and new carriers come into existence whenever the slightest short term demand for the services arose. Unfortunately, short term fluctuated erratically and many carriers were unable to maintain a continuing business. Most carriers were poorly trained and generally unaware of the financial risks accompanying ventures into the transportation industry. Many carriers were incapable of computing rates which allowed an operation to break even, let alone make a profit. Thus, even efficient carriers were forced from the industry by cutthroat competition. See, Norton, Michael, "The Interstate Commerce Commission and the Motor Carrier IndustryExamining Trends Toward Deregulation", 1975 Utah Law Review at 709; citing, S. Doc. No. 152, 73d Cong., 2d Sess. 14, 15 (1934).

The tenuous financial conditions of early motor carriers forced shippers to gamble on acquiring reliable service. The small shipper was extremely vulnerable, because it could not compete with the powerful shippers in the larger industries in obtaining the necessary services. Many small shippers were unable to offer large quantities of products for shipment, and were therefore unable to obtain any transportation services. See, Coordination of Motor Transportation, 182 I.C.C. 263, 380-81 (1932).
[6] Private carriers are not subjected to the same regulation as common and contract carriers because they do not hold themselves out to the public for hire.
[7] The Interstate Commerce Commission under its statutes and regulations does not specifically limit the number of shippers a contract carrier may service, although federal applicants still must meet the definitional criteria of a contract carrier, i.e. "any person not included under paragraph "14" (the definitional paragraph of the term "common carrier"). 49 U.S.C. § 303(a)(15). The Louisiana statute, on the other hand, seems to impose a limit of five shippers, who, incidentally, need not be named (this permits the substitution of shippers from time to time). It does so by creating a presumption that a carrier with more than five contract shippers is really a common carrier, (in the transitional language appearing in the latter half of Section 2, Act No. 301 of the 1938, the Motor Carrier Act, wherein Sec. 2(j) is redesignated as subsection (4) of La.R.S. 45:162).
[8] As will be seen hereinafter, the principles governing common carrier authority apply, although to a lesser degree, to contract carrier authority. It is for these reasons we discuss common carrier authority in this contract carrier case, in this part of the opinion.
[9] These common carrier considerations (Louisiana) comport with the federal statutes and jurisprudence on the matter. Indeed, in Miller Transporters we borrowed most of the considerations verbatim from the ICC's Pan American Buslines Operation, 1 M.C.C. 190 (1936).

Under the federal regulations and jurisprudence on common carrier authority, the first criteria of Pan American, whether the proposed operations will serve a useful purpose responsive to a public demand or need, may be established by proferring evidence of either a contemporary need or a future need. L.P. Transp., Inc., Extension, 126 M.C.C. 427 (1977). To establish a prima facie case of a public need the applicant must state with specificity the transportation service required, including the commodity to be transported, and routes and volume of business the shippers plans on giving the applicant. John Novak Contract Carrier Application, 103 M.C.C. 555 (1967) (Novak was a contract carrier case, but the principles stated therein are applicable as well to the common carrier applicant.)
An existing carrier whose authority overlaps the requested authority may protest the application, for a significant consideration in connection with the application is the effect a grant of authority will have on existing carriers as well as the condition of existing service. See Pan American, supra. To protect certified common carriers, the applicant must affirmatively demonstrate that existing carriers either cannot or will not perform the proposed transportation in a reasonably satisfactory manner. Zuzich Truck Lines, Inc., 83 M.C.C. 625 (1960). Generally, however, in theory at least, protests are invited in order to protect the investment of and to prohibit a loss of traffic to a new market entrant. Another principle, of course, is that the Commission has imposed an affirmative duty on shippers to inform themselves of the availability of existing carriers. Colonial Refrig. Transp., Inc., 123 M.C.C. 255 (1975); P.C. White Truck Line, Inc., 120 M.C.C. 824 (1975).
Where a demographic increase in population or an increase in the volume of shipper's traffic requires additional transportation service, the criteria of need is generally met. Aero Trucking, Inc., 121 M.C.C. 742 (1975); Erie Lackawanna R.R., 110 M.C.C. 823 (1969).
Under the federal jurisprudence, consideration is given to the special needs of the shipper. However, in the absence of a showing that available carriers are inadequate, the ICC will usually deny the entry of a competitive newcomer into the field. Watkins Motor Lines, Inc., 124 M.C.C. 261 (1976); Chandler Trailer Convoy, Inc., 83 M.C.C. 577 (1960). Such authorization would endanger existing carriers by needlessly duplicating services without any corresponding benefit to shippers and receivers. Bestway Express, Inc., 1253 M.C.C. 441 (1975).
Essentially, the matter for determination in the issuance of common carrier authority is whether the advantages to those members of the shipping public would outweigh the actual or potential disadvantages to existing carriers which might result from the institution of the particular shipping operations. All American Bus Lines, Inc., Common Carrier Application, 18 M.C.C. 755 (1939).
[10] In 1980, Congress amended the Motor Carrier Act, relaxing the requirements for the applicant, a move in the direction of de-regulation. Exit of Entry Controls for Motor Common Carriers: Rationale Reassessment, Wagner, William, I.C.C. Practitioners Journal, p. 163, 1981. The counterpart to 49 U.S.C. § 309(b) is now 49 U.S.C. § 10923(b)(3). This present law (Pub.L. 96-258, § 1(9), June 3, 1980, 94 Stat. 426 and Pub.L. 96-296, §§ 10(a)(2), (3), 34(b), July 1, 1980, 94 Stat. 799, 800, 825) directs the Commission to consider, before approving the application for a permit as a motor contract carrier of property:

(A) the nature of the transportation proposed to be provided;
(B) the effect that granting the permit would have on the protesting carriers if such grant would endanger or impair their operations to an extent contrary to the public interest;
(C) the effect that denying the permit would have on the person applying for the permit, its shippers, or both; and
(D) the changing character of the requirements of those shippers.
Because the Louisiana Legislature has not instituted similar changes, we are examining here the state of federal jurisprudence and statutory law prior to the 1980 amendments.
[11] Of the five witnesses, only one testified as to a specific instance of service failure. In that case, he was able to procure transportation services a few hours later, incurring no pecuniary damage.