622 So.2d 640 (1993)
MATLACK, INC., et al.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 93-CA-0277.
Supreme Court of Louisiana.
May 24, 1993.
Rehearing Denied September 2, 1993.
*646 Carolyn DeVitis, Thomas K. Kirkpatrick, Kirkpatrick & Kirkpatrick, Baton Rouge, for applicant.
James L. Ellis, Taylor, Porter, Brooks & Phillips, Baton Rouge, for respondent.
HALL, Justice.[*]
In this direct appeal, we are asked to determine whether the Louisiana Public Service Commission ("LPSC") erred in rendering an order granting L & B Transportation, Inc. ("L & B") a certificate of public convenience and necessity, authorizing it to transport certain liquid products statewide. The LPSC's order expanded L & B's existing motor carrier authority from contract to common carrier.[1] Finding the LPSC erred, the district court rescinded L & B's common carrier certificate and reinstated its contract carrier permit. We affirm.

BACKGROUND FACTS AND PROCEDURAL HISTORY
In November 1985, L & B was granted a contract carrier permit. Under that permit, L & B was authorized, subject to certain exceptions,[2] to transport for Ciba-Geigy *647 and four unnamed shippers within a hundred mile radius of Port Allen, Louisiana; L & B also was authorized to transport hydrochloric acid ("HCI") statewide. In February 1986, L & B filed an application for a common carrier certificate, seeking authority, subject to certain exceptions,[3] to transport liquid products in bulk statewide. After notice, four existing common carriersYounger Brothers, Inc., Stephens Truck Lines, Inc. ("Stephens"), DSI Transports, Inc. ("DSI"), and Groendyke Transport, Inc. ("Groendyke") (collectively the "Protestants")filed protests with the LPSC.
At the hearings conducted before the LPSC in May 1986, L & B presented eleven supporting shipper witnesses who testified as to their individual needs for specialized and prompt services. Protestants presented seven witnesses who testified that they opposed the application based on L & B's alleged lack of fitness, alleged failure to demonstrate a need for the proposed service, and alleged potential loss of revenue and traffic to themselves. In July 1986, the LPSC denied certification. In September 1986, the LPSC, by a split 3-to-2 vote, granted L & B's request for reconsideration. On December 2, 1986, L & B amended its application to "restrict against the transportation of molasses." And, on December 10, 1986, the LPSC, with one commissioner dissenting and one voting to deny, rendered an order granting L & B's application. In March 1987, the LPSC, by a split 3-to-2 vote, denied Protestants' request for rehearing and confirmed its earlier grant of authority to L & B.
Five existing common carriersStephens, Matlack, Inc., DSI, Groendyke, Jobbers Oil Transport, Inc. ("JOTCO"), and Dupré Transport, Inc. ("Dupré") (collectively the "Intrastate Carriers")timely sought judicial review pursuant to LSA-R.S. 45:1192 in the Nineteenth Judicial District Court, Parish of East Baton Rouge. The LPSC answered the appeal, generally denying all the allegations of the petition. L & B intervened, uniting with the LPSC in opposing the appeal.
Before the district court, Intrastate Carriers alleged that the LPSC's grant of common carrier authority was not supported by the evidence in the record and was thus arbitrary and capricious. They further alleged that they will suffer serious economic harm as a result of the LPSC's actions. Finally, quoting the language of LSA-R.S. 45:1192, they prayed that this appeal "shall be given precedence over all other civil cases in the court, and shall be heard and determined as speedily as possible." Despite the latter prayer, this case remained in abeyance for over two years.
In September 1989, the district court rendered its initial decision, reversing the LPSC. The core of the district court's written reasons for judgment is found in the following excerpt:
A close evaluation of the testimony of the supporting shippers has led to the conclusion that the evidence of need required by La.R.S. 45:164 is not present.... The transcript consists of general, conclusory and self-serving statements which are insufficient to prove that the public convenience and necessity require additional service. CTS [Enterprises, Inc. v. Louisiana Public Service Comm'n, 540 So.2d 275, 280 (La.1989)]. Allegations of carrier service failure must be proven by facts [sic] specific instances where the shipper was unable to transport its commodity due to inadequate service....
This record is devoid of specific instances where a shipper has been unable to ship its commodity due to inadequate service. Instead, the testimony is full of generalized statements devoid of documentation or proof.... A factual review of the *648 testimony has led to the conclusion that the burden of L and B has not been met.
The district court, in support of its decision, cited two of this court's decisions dealing with the need to establish the elements of public convenience and necessity. First, citing CTS Enterprises, supra, the court noted that the fact the carrier will provide excellent service does not suffice to establish that the public convenience and necessity will be materially promoted. Second, citing Miller Transporters, Inc. v. Louisiana Public Service Comm'n, 518 So.2d 1018 (La.1988), the court noted that the effect which granting a permit will have upon the existing carriers must be weighed in determining whether the public interest will be served by issuing a certificate. Applying these criteria, the court determined that the LPSC erred in granting L & B's application. Accordingly, the court rescinded L & B's common carrier certificate and reinstated its contract carrier permit.
L & B responded by filing a motion for new trial, which the court granted. Thereafter, an evidentiary dispute arose between the parties, prompting Intrastate Carriers to file a Motion in Limine to restrict the evidence that could be presented at the new trial. The court granted the motion and limited the admissible evidence to that which was in existence at the time the matter was before the LPSC.[4] Based on that evidentiary ruling, no additional evidence was submitted, and in October 1992, the district court adopted its original written reasons for judgment rendered in September 1989 and reinstated its original decision. In adopting its prior written reasons for judgment as its ruling on the new trial, the court, noting the lengthy appellate delay, suspended the operation of its decision pending a ruling by this court on direct appeal.
From that decision, the LPSC and L & B timely perfected the instant appeal to this court pursuant to La. Const. Art. 4, § 21(E). For the reasons that follow, we find, as did the district court, that the LPSC erred in granting L & B a certificate of public convenience and necessity.

ADDITIONAL EVIDENCE
As we write this opinion, six years have elapsed since the LPSC rendered the decision from which this appeal was taken. At the outset, we address a thorny procedural question raised by the parties. L & B strenuously urges that it should be allowed to introduce into the record additional evidence of its six year operating history since the LPSC granted its common carrier certificate. L & B contends that this evidence establishes, albeit after-the-fact, the correctness of the LPSC's decision. In support of this position, L & B relies heavily upon Red Ball Motor Freight, Inc. v. Louisiana Public Service Comm'n, 286 So.2d 337 (La.1973), in which we remanded to the district court for the purpose of allowing additional evidence pursuant to LSA-R.S. 45:1194.[5] On the other hand, Intrastate Carriers strongly oppose, contending that the LPSC's decision must be judged based on the evidence in the record, setting forth the conditions in the transportation industry at the time the LPSC's decision was made. Distinguishing Red Ball, supra, they note that the proffered evidence in that casea cost studydid not involve post-hearing events or occurrences; whereas, *649 the proffered evidence in this case involves just that.
We recognized in Red Ball that LSA-R.S. 45:1194 permits the court in a "proper case" to remand for the purpose of taking additional evidence. 286 So.2d at 340; see Illinois Central Railroad Co. v. Louisiana Public Service Comm'n, 240 La. 854, 125 So.2d 387, 388 (1961) (noting remand is appropriate when interest of justice requires it). Yet, we noted in White v. Louisiana Public Service Comm'n, 259 La. 363, 250 So.2d 368, 372 (1971), that such new evidence should be permitted only in "exceptional cases." We find that this is not such a case.
A remand for purposes of allowing additional evidence is inappropriate when such evidence is not necessary to the determination of the certificate's validity. 60 C.J.S. Motor Vehicles § 92(11) (1969). The LPSC's determination of public convenience and necessity is based on the conditions in existence when the application is filed and in light of the then-existing facts. Guandolo, Transportation Law 66 (1965) ("Guandolo"); 60 C.J.S. Motor Vehicles § 92(6) n. 43 (1969); Brook Ledge, Inc. v. Public Utilities Comm'n, 145 Conn. 617, 145 A.2d 590, 592 (1958); Arizona Corporation Comm'n v. Gibbons, 86 Ariz. 210, 212-13, 344 P.2d 167, 169-70 (1959); Corporation Comm'n v. Pacific Motor Trucking Co., 100 Ariz. 87, 89, 412 P.2d 33, 35 (1966). An assailment of the LPSC's determination cannot be based on facts and occurrences arising subsequent to the LPSC's hearing and findings. Gibbons, supra. Applying these principles here, we find that because the additional evidence L & B seeks to introduceits six year post-hearing operating historyconsists entirely of facts and occurrences arising subsequent to the LPSC's hearing and findings, LSA-R.S. 45:1194 is inapplicable. Thus, we, like the district court, restrict our review to the record.
We note, however, that L & B is not without a remedy; the proper remedy, as suggested at oral argument before this court, is for L & B to file a new application with the LPSC, offering in support its six year track record. See Guandolo at 65 (noting that commission may consider past operations in determining public need for continuance of operations). We further note that the LPSC rules expressly sanction successive applications for common carrier certificates, provided at least six months have elapsed since the last application.[6] We still further note that merely because an applicant has carried on a common carrier business and the public has become accustomed to using that business does not justify the nunc pro tunc grant of authority based on evidence of a presently existing public convenience and necessity for that service, since public convenience and necessity must be evaluated based on the then-existing facts when the application was filed. 60 C.J.S. Motor Vehicles § 90(3) (1969).

PUBLIC CONVENIENCE AND NECESSITY
Under Louisiana law, a motor carrier may not operate as a common carrier without obtaining from the LPSC a certificate of public convenience and necessity. The LPSC may issue such certificate only after giving notice to competing carriers, holding a public hearing, and determining that the public convenience and necessity require the certificate be issued. LSA-R.S. 45:164. Moreover, if the LPSC has already issued a certificate to another carrier to conduct the same operation, the applicant has the burden of clearly showing that the public convenience and necessity would be materially promoted by its issuance. Id.; L & B Transport Co. v. Louisiana Public *650 Service Comm'n, 602 So.2d 712, 714 (La. 1992).
"Public convenience and necessity" is a dynamic and flexible concept, not susceptible to rigid or precise definition; it must be determined on a case-by-case basis. Id.; Florane v. Louisiana Public Service Comm'n, 433 So.2d 120, 123 (La.1983). Evaluating public convenience and necessity in a given case is a matter within the LPSC's sound judgment and discretion. Dreher Contracting & Equipment Rental, Inc. v. Louisiana Public Service Comm'n, 396 So.2d 1265 (La.1981). Accordingly, upon judicial review, the LPSC's determination of whether an applicant has made the requisite showing of public convenience and necessity is accorded great weight and will be overturned only if based on an error of law or if such determination is arbitrary and capricious. L & B, 602 So.2d at 714 (citing Miller Transporters, supra); see also Herman Brothers, Inc. v. Louisiana Public Service Comm'n, 564 So.2d 294, 297 (La.1990) (collecting cases); Radiofone, Inc. v. Louisiana Public Service Comm'n, 573 So.2d 460, 461 (La.1991). The LPSC's determination is arbitrary and capricious only when the evidence in the record does not and could not reasonably support it. L & B, 602 So.2d at 714 (citing Ken-Go Services, Inc. v. Louisiana Public Service Comm'n, 483 So.2d 141 (La.1986)). Conversely, the court has a duty to reverse the LPSC's determination when it is based on an error of law or on material facts that could not have been reasonably found from the evidence. Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Comm'n, 549 So.2d 850, 853 (La.1989).
With the foregoing principles as guidelines, we now turn to the record to determine whether sufficient evidence was presented to support the LPSC's determination that L & B made the requisite showing of public convenience and necessity. Because of the court's reluctance to overturn the LPSC's findings, this opinion contains a detailed discussion of the evidence, divided into two segments: L & B's case and Protestants' case.

L & B'S CASE
L & B is co-owned by William ("Bob") Connors and Louis Vielee. L & B's sole terminal is located in Port Allen, Louisiana. L & B operates nine (LPSC records show ten) trucks and twenty-seven trailers, including four rubber-lined trailers for transporting HCI. L & B leases all of its equipment from Vielee and his affiliated entities, Louis Vielee Trucking and Cajun Trailer Rentals, Inc. ("Cajun"). Cajun is owned by Vielee, Connors, and Mary Firmin. Mary Firmin also owns an affiliated entity, Southern Bulk Distributors and Transportation ("SBDT"), a brokerage company. Vielee also owns two other affiliated entities, Southern Bulk Distributors and Truck Maintenance, Inc. All of the above-mentioned affiliated entities are located in the same office building and share the same telephone number; however, SBDT has a separate office in the building.
At the time of the LPSC hearing, L & B was operating under its contract carrier permit, which allowed it to enter into contracts, which had to be filed with the LPSC, with up to five shippers. L & B had five contracts on file with the LPSC. The five shippers which L & B served directly under contract were: (1) Sid Richardson Carbon Company, Inc., (2) Arkla Chemical Corporation ("Arkla"), (3) Ciba-Geigy Corporation, (4) Cracker Barrel, Inc., and (5) SBDT. Under its contract with SBDT, operations were performed by SBDT in its capacity as a transportation broker; shippers called SBDT to request transportation, SBDT arranged for those requests to be handled by L & B, and SBDT received a commission for soliciting the transportation. Under the SBDT contract, L & B served indirectly eight other shippers; namely: (1) Agrifuel, Inc., (2) Charlotte Chemical Company, (3) Louisiana Oil and Re-Refining Co., Inc. ("Louisiana Oil"), (4) Home Oil Company, (5) Ray's Bait Shop, (6) Southern Bulk Distributors, (7) Pledger Oil Company, and (8) Cajun.
Connors, L & B's president, appeared on L & B's behalf at the hearing. Connors testified that L & B's application was prompted by two factors. One factor *651 was the dubitable nature of its operations under the SBDT contract; as Connors expressed it:
"[T]he question has been asked as to the legality of Southern Bulk Distributors and Transportation, whether or not the way this company is doing business is exactly in compliance with the [Louisiana] Public Service Commission. Whenever this question came up to be raised, whether or not it were legal, we went ahead and applied for common carrier at that time; so, if it is proven that the way Southern Bulk Distributors and Transportation is not in legality, hopefully, we will have a common carrier permit by that time, and it will not affect our business, or any loss of revenues."
The other factor, again in Connors' words, was that "[d]ue to the rising cost of operations, the rising cost of insurance, L & B Transport finds it is necessary at this time to service more than just five contracts. We need an additional increase in revenue to cover expenses." The sum and substance of Connors' testimony was that L & B needed expanded common carrier operating authority because it foresaw financial and legal difficulties with its contract carrier operation.[7]
In further support of its own abilities and in support of its claim that existing carrier service was deficient, L & B presented the testimony of eleven supporting shipper witnesses. L & B's supporting shipper witnesses were representatives of companies that it had served or was still serving, either directly under its contract carrier permit or indirectly through its contract with SBDT.[8] More specifically, three of the supporting shipper witnessesArkla, Cracker Barrel, and Ciba-Geigywere being served directly by L & B under its contract carrier permit; their testimony is capsulized briefly below.
First, Arkla's representative, Richard Gray, testified that his company's primary need was for statewide transportation of HCI, which required specialized equipment, namely, rubber-lined trailers. Generally, Gray stated that L & B had provided Arkla with good service; that he had problems with other carriers; and that if L & B's application was denied, L & B's service might deteriorate. Gray, as the district court correctly commented, gave "no specific testimony regarding why L and B should receive a common carrier permit or why existing companies could not serve its needs."
Second, Jack Kirkendoll of Cracker Barrel, a convenience store chain, stated that his company's monthly transportation needs called for the delivery of one hundred truckloads of gasoline and diesel fuel to its stores and required no special equipment. Kirkendoll further testified that L & B was presently handling those needs, that Cracker Barrel did not use any other carrier, and that L & B had provided good service. When asked why Cracker Barrel was supporting L & B's application when it was being adequately served under L & B's existing authority, Kirkendoll responded that his understanding was that "there's some question about the legality of the (inaudible) contract, and for my protection, aloneit's for very selfish interestsI'd like to see them get common carrier status so that they'd be available to us."
Third, John Bruce of Ciba-Geigy testified that his company transported HCI and *652 petrochemicals predominantly between Baton Rouge and New Orleans and that they used both common and contract carriers. Bruce stated that L & B was handling 25% of his company's inbound transportation needs and that L & B's service was "very good." He further stated that short lead times were important to his company and that L & B's response time had been "a little bit better" than that of other unidentified carriers. He still further stated that Ciba-Geigy was supporting the application because it feared L & B's restricted capacity might result in cash flow problems and because it feared, as the district court put it, "that L and B could lose business and revenues as a result of a violation that was pending before the Public Service Commission involving the legality of a brokerage firm called Southern Bulk Distributors, a company operated in the same building as L and B, through whom L and B was working for several shippers, but apparently only using one name, Southern Bulk, for purposes of its five shipper contract permit." Finally, he stated that if L & B lost its contract carrier authority, Ciba-Geigy would have to make some adjustments.
Also testifying on L & B's behalf as supporting shipper witnesses were five entities L & B served indirectly through its SBDT contractCharlotte Chemical, Louisiana Oil, Ray's Bait Shop, Southern Bulk Distributors, and Cajun.[9] Their testimony is summarized below.
1. John Cowan of Charlotte Chemical testified that his company's primary transportation need was for carriers to handle HCI and that L & B, through SBDT, was the exclusive carrier they used to satisfy that need.[10] Cowan vaguely indicated that his company had problems obtaining rubber-lined trailers on short notice from Matlack and another named carrier. Yet, on cross-examination, Cowan capitulated that Charlotte had lost its HCI contract and that unless and until it was successful in obtaining a new contract, it would have no HCI loads to tender to any carrier. He testified that Charlotte had not tendered any loads to L & B in the preceding six months and that it did not foresee having any loads to tender in the next three months. In short, Cowan's testimony was that Charlotte had no need for service at the time, and his testimony can only be considered as that of a past-satisfied customer. See Fargo Van & Storage, Inc. v. Bevis, 314 So.2d 129, 131 (Fla.1975).[11]
2. Edward McCrary, III, of Louisiana Oil testified that his company's primary transportation need was for carriers to handle 600 to 1,000 loads per year of black oil. McCrary testified that L & B handled a large portion of that need. Many carriers, McCrary stated, disliked handling his commodity, black oil, because it was dirty, difficult to handle, and fouled up their equipment. McCrary expressed his satisfaction with L & B's equipment and service, noting that he supported L & B's application because "without the grant, I will have to let two employees go that I put on since I found L & B; that's how much I've increased my business." Conversely, McCrary expressed his dissatisfaction with other carriers, detailing two instances of alleged service deficiencies.
The first instance occurred in September 1985 and involved Matlack. The job was supposed to take twenty-four hours, with each load taking two hours. Matlack's time per load, however, was five and a half hours; in McCrary's opinion, Matlack took longer because it did not have an appropriate pump on its trailers. McCrary further testified that he then called JOTCO who *653 hauled two loads before its truck broke down; he concluded with "and that was the end of it." He conceded, however, that the job was finished, albeit at a higher cost per load, by using vacuum trucks. McCrary also admitted on cross-examination, when questioned about the fact that Matlack's records contained no mention of loads handled for Louisiana Oil in September 1985, that he might have mixed up the dates.
The second instance occurred in February 1986 when Louisiana Oil required transportation services for moving black oil that had to be completed in ten days or it would incur a considerable demurrage charge on a drilling rig. JOTCO promised five trucks, but only delivered one and only worked one day. On cross-examination, McCrary was questioned as to whether the true story regarding JOTCO's alleged service deficiency was that Louisiana Oil had failed to pay its transportation bills; McCrary denied this allegation. Also, in this instance, McCrary testified that he called DSI and requested five trucks, but only two were supplied. There was some vague testimony regarding transportation via DSI being arranged, and freight charges being paid, by a company called Pathmark. However, DSI's records contained no mention of any transportation for Pathmark. This job was completed using, among others, SBDT.
In discounting this service deficiency testimony, the district court remarked that these were two isolated instances, that these instances both occurred more than six months before the LPSC hearing, and that these instances could not be verified by written documentation. Moreover, Intrastate Carriers argue, and we agree, that this testimony is further undercut by the fact that both jobs were successfully completed by available existing carriers.
3. Ray Patrick of Ray's Bait Shop testified that his transportation needs called for the delivery of two to three loads per week of gas and diesel fuel for resale at his bait shop. Patrick testified that for the past year his transportation needs had been satisfied exclusively by L & B through SBDT, and that before that time he used C & C Transport, Inc., JOTCO, and another named carrier. He further testified that he preferred using L & B because they provided prompt service on short notice; whereas, other carriers required twenty-four hour notice. Patrick did not testify that the other carriers' service was inadequate; to the contrary, he testified that "I'm not saying these people were bad in their service; I'm not trying to say that. I'm just saying they weren't as efficient as Mary [Firmin of SBDT] is, when I can order any time through her."
4. Connors, L & B's president and co-owner, also testified as a supporting shipper witness on behalf of Southern Bulk Distributors, one of Vielee's wholly owned affiliated entities which buys and sells petroleum products. Connors testified that he operated this company out of the same office as he operated L & B, that this company had no paid employees, and that he received no remuneration for operating it. Connors further testified that he had difficulty obtaining carriers to transport his petroleum products on three occasions in April and May 1985. Although Intrastate Carriers, in an attempt to discredit this service failure testimony, made much ado over the fact Connors appeared before the LPSC in two different capacities, applicant and supporting shipper, we find this fact neither novel nor determinative. See Dupré Transportation, Inc. v. Louisiana Public Service Comm'n, 583 So.2d 475, 478 (La.1991). In any event, the district court aptly noted that Connors' testimony and Vielee's testimony (discussed below) "must be viewed in the light that they were owners of L and B and that their motives could have been self-serving." Viewing the testimony in that light, the district court, with which we agree, found the service failure testimony unavailing. In so doing, the court relied upon the fact that the record was devoid of any evidence that other local carriers had been called to fulfill the need; rather, Connors called two out-of-town carriers, Petroleum Transport and C & C, for whom he had formerly *654 worked and whom he may well have known were having operating difficulties.[12]
5. Vielee, L & B's other co-owner, testified on behalf of Cajun, which leases trailers, either empty or loaded with diesel. Cajun's transportation needs were sporadic, ranging from two to fifteen movements per year. The arrangement for these needs was that Cajun took the order for the trailer, Southern Bulk Distributors took the order for the diesel, and SBDT, through L & B, provided the transportation of the trailer. Obviously, Vielee's testimony tells nothing more than the mechanics of how this affiliated entity operated.
L & B presented two other miscellaneous supporting shipper witnesses. The first, James White Trucking, like Cajun, was a Southern Bulk Distributors customer. Terry Mansur, appearing on James White Trucking's behalf, testified that they required twelve to fifteen truckloads of diesel fuel per year, which, of course, was shipped for the seller, Southern Bulk Distributors, through SBDT, by L & B. Interestingly, Mansur was unaware of how his fuel was transported and indicated that the grant of L & B's application would not in any way change the service his company was presently being provided.
The other witness was James Breland of Louisiana Aircraft, Inc.[13] Breland testified that his transportation needs called for the delivery of aviation fuel that he acquired from Exxon and that Exxon trucks generally delivered his fuel. About twice per month, however, Exxon employed an outside carrier to transport the aviation fuel to him. Among the carriers Exxon had employed were JOTCO and Dupré. While Breland complained that existing carriers had made late deliveries, on cross-examination, he admitted that he did not arrange for the carriers; instead, Exxon made the arrangements. Breland thus had no personal knowledge of the details of the arrangements Exxon would make with the carriers. Hence, his testimony regarding service deficiency, as Intrastate Carriers correctly contend, is hearsay and thus carries little, if any, weight. See Herrin Transportation Co. v. Louisiana Public Service Comm'n, 241 La. 174, 127 So.2d 541, 544 n. 2 (1961).
To summarize, the overall tone of L & B's supporting shippers' testimony was that their transportation needs were presently being satisfied by L & B, directly or indirectly; that they preferred doing business with L & B because, among other things, it provided quick response, short notice service; and that they supported L & B's application because they feared L & B's operations under its contract carrier permit were in jeopardy, financially and legally. Their testimony basically amounted to a testimonial that L & B had provided good service in the past via its contract carrier permit and that it would continue to provide such service if the certificate was issued.

PROTESTANTS' CASE
Seven intrastate common carriers having a diverse range of operating authority, completely overlapping the additional authority sought by L & B, testified in opposition to L & B's application.[14] All of these opposing carriers presented similar testimony. The overall tone of their testimony was that they were willing and able to handle the supporting shippers' business; that their equipment and services were presently underutilized because of a general economic downturn; that they had no *655 problems handling the business tendered to them; that their business, and concomitantly their revenues were declining (several opposing carriers were presently sustaining intrastate operation losses); that they needed additional business; and that the dilution of the intrastate business and revenues that would follow from the grant of an additional certificate could result in an overall decline in the quantity and quality of available service.
Opposing carriers also testified that L & B's application should be denied as L & B failed to provide any supporting evidence at the hearing for many of the liquid commodities for which it was seeking expanded authority; opposing carriers emphasized that L & B's supporting evidence was confined to five commodities: HCI, black oil, gasoline, diesel fuel, and aviation fuel. As to these commodities, opposing carriers testified that one or more of them had the authority and capacity to serve all the supporting shippers' reasonable transportation needs. In fact, opposing carriers unanimously testified that they collectively had served most of the supporting shippers without receiving any complaints; to the contrary, they presented evidence to discredit the supporting shippers' allegations of isolated instances of service deficiencies, discussed elsewhere.
To further support their contention that there is no need for the additional transportation service L & B proposes to offer, several of the opposing carriers filed exhibits into evidence detailing their equipment, investment, and facilities. Similarly, one of the opposing carriers testified that it was in the process of expanding its intrastate facilities in an effort to recoup its past intrastate operation losses and that its investment would be impaired or jeopardized if L & B's application was granted. Echoing the testimony of the opposing carriers in general, another opposing carrier, in its prepared statement, attested that granting L & B's application would have a "material adverse effect" upon it and upon the service that it renders to the public. None of Protestants' evidence was contradicted.
In summation, opposing carriers testified that they were not only well-equipped and capable of providing the proposed transportation service in satisfaction of the public convenience and necessity, but also that they had idle capacity (excess, unused equipment), declining revenues, increasing expenses, and a definite need for additional business.

PRECEPTS
When, as here, there are existing carriers, the burden is on the applicant to show that the public convenience and necessity require the issuance of the certificate. LSA-R.S. 45:164. We have laid down a two-prong test for determining whether an applicant has met this onerous burden of proof; specifically: (A) applicant must prove that the service it offers is required by public convenience and necessity by establishing that: (1) its proposed operation will serve a useful public purpose for which there is a public need or demand; (2) existing carriers cannot and will not serve this public purpose as well as applicant; and (3) applicant's new operation can serve this public purpose without endangering or impairing the existing carriers' operations contrary to the public interest;[15] and (B) applicant must further establish clearly that its proposed new operation will materially promote the public convenience and necessity. L & B, 602 So.2d at 714 (citing Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Comm'n, *656 549 So.2d 850 (La.1989)); Gulf-Coast Pre-Mix Trucking v. Louisiana Public Service Comm'n, 336 So.2d 849, 854 (La.1976) (collecting cases).
1. Public Need or Demand
The foremost requirement an applicant must demonstrate is a public need or demand for its proposed operation. CTS Enterprises, Inc. v. Louisiana Public Service Comm'n, 540 So.2d 275, 280 (La. 1989) (collecting cases); Hutchinson and Chandler, Evidence in Motor Carrier Application Cases, 11 Vand.L.Rev. 1053, 1061 (1958) ("Hutchinson"). Applicant must demonstrate that its proposed operation is "responsive to public demand left unsatisfied by existing authorized carriers." Gulf-Coast, 336 So.2d at 855. Stated otherwise, what is contemplated by this requirement is "a definite public need for a transportation service for which no reasonably adequate public service exists." 60 C.J.S. Motor Vehicles § 90(1) (1969); Mason v. Public Utilities Comm'n, 34 Ohio St.2d 21, 295 N.E.2d 412, 414 (1973). This requirement may be satisfied by proof of either a contemporary need or a future need. CTS Enterprises, 540 So.2d at 281 n. 9; Guandolo, supra at 61. Proof of a future need requires more than a shipper's hope of obtaining new customers from competitors; if the shipper lacks a definite plan for securing new business, the evidence is too speculative to establish a future need. Hutchinson, supra at 1065.
Applicant must establish public need by substantial, competent evidence. Louisiana Tank, 549 So.2d at 854. General, conclusory or indefinite assertions of a need for service do not constitute competent evidence; rather, applicant must make "an explicit showing of a need and that service of the type offered or its equivalent is not otherwise available." Guandolo, supra at 58; see Big Diamond Truck Service, Inc. v. Louisiana Public Service Comm'n, 553 So.2d 431, 433 (La.1989) (collecting cases) (burden of proof must be met by proving "specific facts" rather than "general, conclusory statements"); Gulf-Coast, 336 So.2d at 855 ("generalities do not suffice"). As a practical matter, this is customarily done through the applicant putting on testimony by supporting shipper witnesses to establish the facts required to meet this burden of proof. Id.; Hutchinson, supra at 1061-62.
A prima facie case of public need requires that the applicant, generally through its supporting shipper witnesses, state with specificity the transportation needs believed to be required. Simply put, the supporting shipper witnesses must tell the LPSC three things: (1) what is to be shipped (the commodity to be transported), (2) where it is to be shipped to (the routes), and (3) how much traffic will be available (the volumes of business the shippers plan on giving the applicant). Louisiana Tank, 549 So.2d at 854; CTS Enterprises, 540 So.2d at 281 n. 9. An applicant who fails to demonstrate that supporting shippers' needs are significant; fails to have supporting shippers specify the volume, frequency of movement and type of commodity to be hauled; and fails to demonstrate that supporting shippers have sought to avail themselves of existing carriers' services will not succeed in carrying its burden of proof. Louisiana Tank, 549 So.2d at 854; see Chandler, Convenience and Necessity: Motor Carrier Licensing by the Interstate Commerce Comm'n, 28 Ohio St.L.J. 379, 392 (1967) ("Chandler"); Dempsey, Entry Control Under the Interstate Commerce Act: A Comparative Analysis of the Statutory Criteria Governing Entry in Transportation, 13 Wake Forest L.Rev. 729, 736-37 (1977) ("Dempsey").
Public need contemplates the need of the entire public affected by the new or expanded operations, as distinguished from that of a select individual or group of individuals. Louisiana Tank, 549 So.2d at 854 (citing Miller Transporters, 518 So.2d at 1019, and CTS Enterprises, 540 So.2d at 281); Big Diamond, 553 So.2d at 433. Consequently, an applicant who demonstrates only shipper desire or preference for a particular carrier, without regard to the existence of other facilities capable of meeting its transportation requirements,[16] *657 will not succeed in carrying its burden of proof. Louisiana Tank, 549 So.2d at 854-55 (citing CTS Enterprises, 540 So.2d at 284); see also Hutchinson, supra at 1062-63. Nor is the fact that the applicant has provided or will provide supporting shippers with excellent service sufficient to satisfy the burden of proof. CTS Enterprises, 540 So.2d at 281 (citing Scotty's Vacuum Service, Inc. v. Louisiana Public Service Comm'n, 450 So.2d 1303, 1304 (La.1984)); South Arkansas Vacuum Service of Louisiana, Inc. v. Louisiana Public Service Comm'n, 457 So.2d 655, 659-60 (La.1984).
In the instant case, the evidence in the record falls far short of establishing a public need or demand for L & B's proposed expanded operation. Both Connors' testimony and the supporting shipper witnesses' testimony provide practically no information respecting the present and future transportation needs L & B proposes to serve with its expanded operation; instead, their testimony consists primarily of general, conclusory, self-serving statements, which are legally insufficient.
Connors, in testifying on L & B's behalf, simply indicated that he believed his trucking business would branch out and flourish if he were granted additional operating authority, not that he sensed an ascertainable statewide public need or demand for the proposed service, i.e., statewide bulk liquid commodity transportation authority. Likewise, L & B's eleven supporting shipper witnesses failed to testify to any significant need for the proposed service.[17] To the contrary, as several of the opposing carrier witnesses pointed out in their testimony, the record is devoid of any evidence to support L & B's broad based application for authority to transport almost any type of bulk liquid commodity statewide. L & B's evidence was limited to the needs of carriers in the areas in and surrounding Baton Rouge and Port Allen, and, as opposing carriers emphasized in their testimony, its evidence related solely to a handful of commodities.
Significantly, while the supporting shippers expressed a desire for L & B's proposed service, there is nothing definitive in the record reflecting that they would use the new service to any great extent. None of the shippers articulated any significant, unfulfilled need that the proposed service would satisfy, or testified that any of their reasonable transportation needs were not being served by existing carriers. Quite the contrary, they indicated that numerous existing carriers had been and could be called upon to service their transportation needs.
Summarizing, the supporting shippers' campaign for L & B's application was candidly premised, not on their need for the proposed service, but on their preference and desire for L & B because of its excellent service record; ability to furnish quick response, short notice service; ability to furnish specialized equipment, including rubber-lined trailers for HCI; and willingness to deal with troublesome commodities, such as black oil. Again, neither shipper preference for a particular carrier, nor the fact the carrier provides excellent service is a relevant consideration in determining public need. Big Diamond, 553 So.2d at 434.
*658 2. Inadequacy of Existing Carrier Service
The inadequacy of existing carrier service is a basic ingredient in the determination of what constitutes public convenience and necessity. Louisiana Tank, 549 So.2d at 855; Chandler, supra at 395. To protect existing carriers providing adequate and dependable service, an applicant must affirmatively demonstrate that the available transportation service is inadequate in that existing carriers are either incapable or unwilling to handle a specific shipping need in a reasonably satisfactory manner. Louisiana Tank at 855 (citing Dempsey, supra at 739). Existing carrier service has been deemed satisfactory when it is shown that existing carriers are able and willing to meet shippers' reasonable transportation needs. Guandolo, supra at 60; Mason v. Public Utilities Comm'n, 34 Ohio St.2d 21, 295 N.E.2d 412, 414-15 (1973). When existing carrier service is satisfactory, they generally will be protected against the injection of a newcomer whose additional service is not warranted by the public interest. Stated otherwise, "[e]xisting carriers are ordinarily entitled to handle all traffic which they can transport adequately, efficiently and economically within the scope of their respective operating authorities before a new competitive operation will be authorized, at least where it cannot be demonstrated that the existing carriers are unable or unwilling to satisfy the reasonable transport[ation] requirements of the shipping public." Louisiana Tank, 549 So.2d at 855 (collecting cases); Dempsey, supra at 742.
To meet its burden of establishing the inadequacy of existing carrier service, an applicant must establish that the shippers have attempted and failed to obtain service or that service, when obtained, was deficient. Louisiana Tank, 549 So.2d at 856. Shippers' allegations of service deficiencies must be proven by fact specific instances in which the shipper was unable to transport its commodity as a result of inadequate service. CTS Enterprises, 540 So.2d at 281 (citing Louisiana Tank v. Public Service Comm'n, 442 So.2d 1124, 1129 (La.1983)). In so doing, an important item to be established by shipper testimony is that shippers have investigated available services. Dempsey, supra at 739. Applicant has the burden of establishing this element of the case; this is not a matter to be left for protestants to bring out on rebuttal. Hutchinson, supra at 1066. "Authorized carriers are not required to seek out the shipper, and the fact that an opposing carrier has not solicited the business of the supporting shipper is of no particular importance." Louisiana Tank, 549 So.2d at 856. Shippers have an affirmative duty to inform themselves of the available existing services before seeking authority for additional carriers. Id.; see Hutchinson, supra at 1066.
In addition, an applicant who proposes to provide a "novel and unique" transportation service for which a public need exists that cannot or will not be satisfied by existing carriers will generally be granted a certificate. Dempsey, supra at 770; Chandler, supra at 394; Comment, Public Convenience And Necessity In Federal Motor Common Carrier Cases What Are The Criteria?, 16 S.D.L.Rev. 351, 371 (1971) ("Comment"). To establish this fact, shippers should introduce evidence establishing their need for "a new, fast, flexible, improved service that cannot be provided by the existing carriers." Id. at 379. Thus, an applicant may establish that existing carriers are unable or unwilling to provide adequate service in one of two ways: either by proving existing carrier service is inadequate or by proving it can offer a "novel and unique" service. Dempsey, supra at 770; Comment, supra at 377. L & B established neither.
First, L & B, through its supporting shipper witnesses, attempted to paint a picture of inadequate existing carrier service, citing a couple of instances in which the shippers were unable to obtain trucks from other carriers or in which a carrier was not immediately available. This evidence of existing carrier service deficiencies was undermined by several factors. One, L & B's shipper witnesses' complaints lacked the requisite specificity; these complaints consisted *659 of vague accounts of isolated instances, none of which was corroborated by any written documentation or logs. Two, these complaints all were directed at an alleged service deficiency of a single carrier or, at most, a handful of carriers, and did not call into question the totality of the existing available transportation service; in fact, in these instances, no effort was made to contact competing carriers. Three, and most significantly, a fundamental flaw in L & B's reliance on these alleged service deficiencies to establish the inadequacy of existing carrier service is that they all involved shippers' difficulties in obtaining service on short notice or for emergency jobs.
When, as here, the delays complained of involve solely an inability to provide emergency service or service on very short notice, and under normal operating conditions, existing carrier service is satisfactory, no new service should be authorized. Hutchinson, supra at 1071; 60 C.J.S. Motor Vehicles § 90(5) n. 38.5 (1969) (reasonable adequacy of existing service suffices to defeat an application for additional service). When a shipper makes unreasonable transportation demands on a carrier, such as seeking specialized equipment on very short notice or expecting delivery in an exceptionally short time, the carrier's failure to fulfill these demands does not compel a finding that existing carrier service is deficient. Hutchinson, supra at 1071; see Gulf-Coast Pre-Mix Trucking v. Louisiana Public Service Comm'n, 336 So.2d 849, 854 (La.1976); Dempsey, supra at 738 n. 35 ("emergency transportation requirements of a shipper arising during extraordinary peak periods of business activity are an insufficient basis upon which to predicate a grant of permanent operating authority.") As L & B's alleged service deficiencies all involved short notice or emergency service requests, this evidence does not support a finding that the existing carrier service was deficient. At best, this evidence establishes that existing carriers might have been unable to specifically meet every service demand with their own equipment.
Second, L & B touts its quick response, short notice service and attempts to equate it with a "unique or novel" service and to paint existing carrier service as "service with a delay." This argument is unavailing, factually and legally. Factually, that L & B provides service quickly and on short notice (i.e., with little lead time) cannot be equated with a showing that the existing carriers' services are inadequate; several of the Intrastate Carriers testified that they, like L & B, dispatch trucks on a twenty-four hour a day, seven-days a week basis. See Fargo Van & Storage, Inc. v. Bevis, 314 So.2d 129, 133 (Fla.1975) (finding applicant's provision of Spanish speaking drivers could not be equated with a unique service). Legally, absent some special shipper need for quick servicesuch as when time is of the essence and fragile and/or perishable commodities are being transported[18]merely because an applicant can provide faster service than existing carriers is not alone a sufficient basis on which to predicate a finding of public convenience and necessity. As one court noted in rejecting a similar contention,
There is no showing that any of the supporting shippers have actually suffered any loss of business or been materially inconvenienced through the use of existing service. While it may be that applicant could provide a somewhat faster service than is at present available, and in so doing the supporting shippers would receive certain benefits, these advantages alone are not sufficient reason here upon which to base a finding of public convenience and necessity.
Guandolo, supra at 59 (quoting Otto Pirkle ExtensionWisconsin, 54 M.C.C. 461, 464). That reasoning is equally applicable in the present case, especially considering that L & B's response time, as one of its supporting shipper witnesses characterized *660 it, was only "a little bit better" than that of the other carriers.
That the evidence in the record fails to support a finding of inadequacy of existing carrier service is further buttressed by the following miscellaneous factors: (1) none of the supporting shipper witnesses testified that they attempted and failed to obtain service, or that service, when obtained, was veritably inadequate; (2) none of the supporting shipper witnesses testified that they had investigated the available service or called the LPSC for a list of available existing carriers; (3) several of the supporting shipper witnesses conceded that numerous existing carriers were available to perform the proposed service, but admitted that they either had never called upon them or that it had been a long time since they called upon them; and (4) not one of the supporting shipper witnesses branded the existing transportation services as inadequate, either in quality or quantity; to the contrary, one supporting shipper witness expressly stated that he was not so testifying. In sum, the upshot of L & B's supporting shipper witnesses' testimony was not that they were unable to obtain adequate service from, or were dissatisfied with, existing carriers, but that they were doing business with, and preferred and desired to continue doing business with, L & B because of their previous highly satisfactory experience. Once again, shipper preference is not a relevant consideration in determining public convenience and necessity. Big Diamond, 553 So.2d at 434.
To recap, an applicant must affirmatively establish a need for service based on "a consistent or recurring inability to secure adequate and satisfactory service from existing carriers." Louisiana Tank, 549 So.2d at 857. L & B failed to make such showing. The record in this case, contrary to L & B's contentions, contains no evidence that existing carriers' services were materially inadequate or that L & B proposed to offer anything in the way of transportation services that is not already available in abundance, and indeed underutilized, over existing carriers' lines.
3. Effect on Existing Carriers
Even when an applicant successfully shows that its proposed new operation will serve a public need or demand that existing carriers could not or would not serve, the applicant must still show that the advantages to the shipping public (shippers' needs for the new service) outweigh the actual or potential disadvantages to the existing carriers (adequacy of existing carrier service) that may result from granting the certificate. Louisiana Tank, 549 So.2d at 856; Dempsey, supra at 735. In other words, while it is axiomatic that a grant of additional authority which allows a new competitor to enter a market already served by existing carriers will result in adverse effects on those carriers, existing carriers have a basis for complaining only if the added service is not in the public interest. Hilt Truck Line, Inc. v. United States, 532 F.2d 1199, 1203 (8th Cir.1976). The question in the present case thus becomes whether the LPSC was unreasonable in its evident conclusion that the addition of L & B's operations to the intrastate transportation supply would bring about sufficient improvement in existing service to justify the costs to existing carriers entailed in making that improvement.
As noted above, absent a showing that the services of existing available carriers are materially inadequate, the public convenience and necessity generally is not promoted by authorizing the entry of a competitive newcomer into the field. Louisiana Tank, 549 So.2d at 855-56; A-1 Moving & Storage, Inc. v. Louisiana Public Service Comm'n, 548 So.2d 934, 935-36 (La.1989).[19] Depriving existing carriers of traffic which they are authorized to transport *661 by diluting the field with the addition of a new competitive service may prevent existing carriers from operating at full capacity, and may result in idle equipment and employees, declining revenues, inactive terminals and inefficient operations. Louisiana Tank, 549 So.2d at 856. The public interest is not promoted because "[t]he authorization would endanger existing carriers by instituting needlessly duplicative transportation services which have not been proven to be responsive to the public need. Moreover, no corresponding benefit to shippers and receivers of the involved commodities would result." Dempsey, supra at 740. And, as we have recognized, "[t]he public is ultimately the loser as the result of unnecessary duplication of utility or transportation facilities. Reduction in income and revenues of existing carriers causes the inevitable reduction of services and schedules." Gulf-Coast, 336 So.2d at 855 (citing Herrin, supra). Hence, the grant of additional authority in this context would be contrary to the public interest. Such is the case here.
L & B not only failed to present sufficient evidence to establish public need or demand and the inability or unwillingness of existing carriers to provide the proposed service, it also failed to present any evidence that its new certification as a common carrier would not adversely affect existing carriers. On the other hand, opposing carriers generally testified that their costs were rising and their revenues dwindling, that they had idle equipment, and that certification of a new carrier would cause further damage to their already depressed businesses. By the same token, Connors testified that one of L & B's reasons for expanding its operations was to cover its own rising operating costs. Obviously, L & B failed to meet its burden of showing that the public interest would be promoted by granting its application.
4. Clear Showing of Material Promotion
The evidence of public need or demand in this case was so indirect and speculative as to fail to establish that even the minimal, ordinary requirement of public convenience and necessity would be met by L & B's proposed expanded operation. It follows that L & B's case is even more lacking of proof when measured by the more stringent standard of LSA-R.S. 45:164, which requires the applicant show clearly that the new operation not only will serve, but also will materially promote the public convenience and necessity. See Louisiana Tank, 549 So.2d at 857.

CONCLUSION
L & B failed to introduce sufficient evidence to establish that its proposed new operation would serve a useful public purpose that could not or would not be served by existing carriers. Nor did L & B offer any evidence that its certification would not damage existing carriers' business. Accordingly, we hold that the LPSC could not reasonably have determined that there was a clear showing that the public convenience and necessity would be materially promoted by granting a certificate of public convenience and necessity to L & B.
While we are not insensitive to the policy argument L & B raised in its oral and written arguments regarding the protracted appellate delay in this case, we nonetheless find that argument unpersuasive. Our decision, of course, does not prevent L & B from submitting another application for common carrier authority to the LPSC, and supporting that application with direct evidence of its six year operating history to establish a present public need and demand for its services. We hold only that, based on the record before us, L & B has failed to meet the onerous statutory requirements of LSA-R.S. 45:164 in the present case.

DECREE
For the above reasons, the judgment of the district court, reversing the LPSC's order *662 granting L & B a common carrier certificate and reinstating L & B's contract carrier permit, is affirmed and all costs of this appeal are assessed against the appellants, the LPSC and L & B.
AFFIRMED.
WATSON, J., dissents and will assign reasons.
WATSON, Justice, dissenting.
The majority affirms the trial court, which reversed the Louisiana Public Service Commission for error. Both the trial court and this Court have reviewed the Commission's order under an improper standard. The question is not whether the Commission erred but whether its order was arbitrary and capricious. Louisiana Oil. Car. Ass'n, Inc. v. Louisiana P.S. Com'n, 281 So.2d 698 (La.1973); Florane v. Louisiana Public Service Com'n, 433 So.2d 120 (La.1983); Ken-Go Services, Inc. v. Louisiana Public Service Commission, 483 So.2d 141 (La.1986); Yazoo M.V.R. Co. v. Louisiana Public Service Com'n, 170 La. 441, 128 So. 39 (1930). In addition to applying an incorrect standard, the majority errs in revoking a common carrier's certificate which was granted six years ago. As a matter of public policy, it is unreasonable to revoke a certificate under which a carrier has been operating for six years.
I respectfully dissent.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Calogero, C.J., was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] LSA-R.S. 45:162 divides regulated motor carriers into two classes: contract and common. A "common carrier by motor vehicle" is defined as a person in the business of transporting people or property for compensation and available to the public in general; whereas, a "contract carrier by motor vehicle" is defined as any person not a common carrier who transports people or property by vehicle for compensation under special, individual contractual agreements. Dupré Transport, Inc. v. Louisiana Public Service Comm'n, 556 So.2d 588, 589 n. 1 (La.1990) (citing CTS Enterprises, Inc. v. Louisiana Public Service Comm'n, 540 So.2d 275, 278 (La.1989)). LSA-R.S. 45:162(5) creates a presumption that a carrier with more than five contract shippers is a common carrier. Dupré Transport, 556 So.2d at 589 n. 2.
[2] L & B's contract carrier authority was "[r]estricted against the transportation of oilfield equipment, materials and supplies, against the transportation in vacuum equipment and against the transportation of dry bulk, cement, lime, fly ash, flue dust, mineral filler, drilling mud, fertilizer and fertilizer compounds in bulk tank vehicles or in sacks on flatbed equipment, and restricted against the use of dump trucks."
[3] The common carrier authority sought, and eventually granted, was "[r]estricted against the transportation of oilfield equipment, materials and supplies and against the transportation in vacuum tank equipment." As noted elsewhere, L & B subsequently agreed to a further restriction against the transportation of molasses.
[4] From that evidentiary ruling, the parties applied for supervisory writs, which this court denied. Matlack, Inc. v. Louisiana Public Service Comm'n, 605 So.2d 1130 (La.1992).
[5] LSA-R.S. 45:1194 provides:

If, upon the trial of any suit brought to contest any decision, act, rule, rate, charge, classification, or order, of the commission, the plaintiff introduces evidence which is found to be different from that offered upon the hearing before the commission, or additional thereto, the court, before proceeding to render judgment, unless the parties to such action stipulate in writing to the contrary, shall send a transcript of such evidence to the commission, and stay proceedings in the suit for fifteen days from the date of such transmission. Upon the receipt of the transcript, the commission shall consider the evidence, and it may alter, modify, amend, or rescind its decision, act, rule, rate, charge, classification, or order, complained of in the suit and shall report its action to the court within fifteen days from the receipt of the transcript.
[6] LPSC Rules of Practice and Procedure, Rule 52, provides for the refiling of applications; it reads:

"When any application for a Certificate of Public Convenience and Necessity, or for a permit as a contract carrier by motor vehicle, has been heard by the Commission and withdrawn or denied, the Commission will not entertain further application from the same applicant concerning identical or similar routes, schedules and/or service until the expiration of six months from the date of such denial."
[7] Connors also testified regarding L & B's previous history of statutory violations. Specifically, L & B previously had pled guilty to operating without authority, which was before it received its contract carrier permit. L & B also was at the time of the hearing under investigation for an alleged violation of its contract carrier permit for transporting for over the five shipper maximum; it had pled not guilty to this charge. When, as here, the public need for the proposed service is not established, the issue of the applicant's fitness need not be reached. Dempsey, Entry Control Under the Interstate Commerce Act: A Comparative Analysis of the Statutory Criteria Governing Entry in Transportation, 13 Wake Forest L.Rev. 729, 760 (1977) ("Dempsey") Suffice it to say that L & B's past history of violations could not in any way aid its case.
[8] The record is unclear as to whether one of the supporting shippers, Louisiana Aircraft, Inc., was a present or past, direct or indirect customer of L & B. The record simply reflects that Louisiana Aircraft had not been a customer of Southern Bulk Distributors.
[9] Actually, six shippers indirectly served by L & B through SBDT presented evidence, but one of these witnesses' testimony was rendered irrelevant by L & B's restrictive amendment to its application removing molasses.
[10] He noted a minor exception; on one occasion about six months before the LPSC hearing, at a third party's request, they used Matlack to transport one load.
[11] As discussed elsewhere, while future demand is sufficient to establish public need, Cowan's testimony as to his company possibly obtaining the bid on a future HCI contract, which bid it lost the prior year, is too speculative and indefinite to establish future need.
[12] In fact, Petroleum Transport was in Chapter 11 bankruptcy. Moreover, the record reflects that these same service failures were relied upon, and read into the record, by L & B at the hearing on its contract carrier application. Hence, this testimony relates to events alleged to have occurred some time before the present application was filed.
[13] See note 8, supra, regarding the ambiguity of whether this shipper was a L & B customer.
[14] The seven carriers that testified in opposition to the application were as follows: (1) G.O. Coleman of Stephens Truck Lines, Inc.; (2) Thomas D. Jeansonne of Jobbers Oil Transport Company, Inc. ("JOTCO"); (3) Ethelyn Gautreau of Matlack, Inc.; (4) Ron Paradoski of DSI, Inc.; (5) Tom Voelkel of Dupre Transport, Inc.; (6) F.J. Tillery of Younger Bros., Inc.; and (6) John C. Mangano of C & C Transport, Inc.
[15] In Miller Transporters, supra, we borrowed these factors virtually verbatim from the federal Interstate Commerce Commission jurisprudence; particularly, these factors were articulated in the form of a tri-partite test in the seminal decision, Pan-American Bus Lines Operations, 1 M.C.C. 190 (1936), and have since become well ingrained in the jurisprudence. CTS Enterprises, Inc. v. Louisiana Public Service Comm'n, 540 So.2d 275, 281 n. 9 (La.1989); Guandolo, supra at 43-44. The gist of the Pan-American test is that the commission must weigh and balance the public's interest (need for service) with the protesting carriers' interest (adequacy of existing service) and arrive at a reasoned determination. Comment, Public Convenience And Necessity In Federal Motor Common Carrier Cases What Are The Criteria?, 16 S.D.L.Rev. 351, 366 (1971).
[16] The need for additional services is directly related to the adequacy of existing carriers, a factor separately discussed below. However, as we have expounded, "[t]he mere fact that service rendered by existing motor carriers is allegedly inadequate is not sufficient to establish the right of another carrier to a certificate of convenience and necessity unless it further appears that there is a public necessity for the additional service." Miller Transporters, 518 So.2d at 1020; Truck Service, Inc. v. Louisiana Public Service Comm'n, 256 La. 343, 236 So.2d 491, 493 (1970) (adequacy of existing carriers to render the proposed service is not determinative). Hence, an applicant is not relieved of this requirement of demonstrating a public need even when the existing carriers' service is found inadequate. Guandolo, supra.
[17] That a considerable number of shippers appear as supporting witnesses to profess a need for the proposed service is not determinative of the public convenience and necessity for such service. Guandolo, supra at 58.
[18] Comment, Public Convenience And Necessity In Federal Motor Common Carrier CasesWhat Are The Criteria?, 16 S.D.L.Rev. 351, 372 (1971).
[19] A finding of inadequacy of existing carrier service, however, is not a prerequisite to granting a certificate. Indeed, inadequacy of present service is only one factor considered in determining public convenience and necessity. Dempsey, supra at 743. See discussion in note 16, supra. Other elements considered to gauge public interest include "`the desirability of competition, the desirability of different kinds of service, and the desirability of improved service.' " Comment, Public Convenience And Necessity In Federal Motor Common Carrier CasesWhat Are The Criteria?, 16 S.D.L.Rev. 351, 369 (1971). All these facts must be considered as "interrelated parts of a whole picture" in determining whether the public interest warrants granting an application for new authority. Chandler, supra at 395.