602 So.2d 712 (1992)
L & B TRANSPORT COMPANY, INC., et al., Groendyke Transport, Inc., DSI Transports, Inc.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 91-CA-1429.
Supreme Court of Louisiana.
June 26, 1992.
Dissenting Opinion June 26, 1992.
*713 Janet S. Boles, Boles, Boles & Ryan, John S. Hunter, Courtenay, Forstall, Guilbault, Hunter and Fontana, James J. Thornton, Johnston & Thornton, for appellants.
Robert L. Rieger, Jr., Carolyn DeVitis, James M. Field, Rachelle Deckert Dick, Gary, Field, Landry & Bradford, for appellee.
Dissenting Opinion by Dennis, Justice June 26, 1992.
LEMMON, Justice.
This is an appeal from a judgment of the district court which affirmed an order of the Louisiana Public Service Commission (PSC) granting a certificate of public convenience and necessity to Mississippi Chemical Express, Inc. (MCX) to operate as an intrastate common carrier of liquid and dry chemical commodities.
MCX has been a certificated contract carrier in the State of Louisiana for thirty-four years and has handled the transportation of bulk chemicals, including corrosives, acids and other commodities requiring specialized equipment and handling. At the time of its application, MCX was transporting chemicals in Louisiana under both its interstate common carrier authority and intrastate contract carrier permit. MCX has terminals and employees in Baton Rouge, Bossier City, Lake Charles, and LaPlace.
When MCX applied for a intrastate common carrier certificate, protests were filed with the PSC by L & B Transport Company, Inc., Matlack, Inc., Montgomery Tank Lines, Inc., Miller Transporters, Inc., Groendyke Transport, Inc., and DSI Transports, Inc.[1] All protestants are common carriers with existing certificates authorizing transportation statewide.
At the hearings conducted before the PSC's hearing examiner, MCX presented eight shippers who testified as to their individual needs for specialized and prompt services, and the protestants presented four witnesses in opposition to the application. The PSC unanimously granted *714 MCX's application and simultaneously cancelled MCX's contract carrier permit.
On appeal, the district court, particularly noting that the paper company shippers could not get service during periodic down periods from the existing carriers, affirmed the PSC's grant of authority. Hence, the appeal to this court. La. Const. art. IV, § 21(E).
A motor carrier may not operate as a common carrier in Louisiana until it obtains a certificate of public convenience and necessity from the PSC. The certificate may be issued only upon a finding by the PSC, after notice to competing carriers and a public hearing, that public convenience and necessity require the issuance. If the PSC has already granted a certificate to another carrier to conduct the same operations, the applicant must clearly show at the hearing that the public convenience and necessity would be materially promoted by the issuance of the additional certificate. La.Rev.Stat. 45:164; Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Commission, 549 So.2d 850 (La. 1989); Florane v. Louisiana Public Service Commission, 433 So.2d 120 (La.1983).
Public convenience and necessity is a term which is not susceptible of precise definition and must be determined on a case by case basis. Florane v. Louisiana Public Service Commission, 433 So.2d 120 (La.1983). This court has set forth criteria to be considered in determining public convenience and necessity for issuance of additional common carrier certificates:
To be a "public necessity" the new motor carrier service does not have to be absolutely indispensible, but it must provide such an improvement of the existing transportation service as to warrant the cost of making the improvement. Among the factors which may be considered in determining public convenience and necessity are whether the new operation or service will serve a useful public purpose, responsive to public demand or need, whether this purpose can and will be served as well by existing carriers, whether it can be served by the applicant without endangering or impairing operations of existing carriers contrary to public interest, and whether it can be served by the applicant without undue jeopardy to highway users or to the structure and safety of the road. The mere fact that service rendered by existing motor carriers is allegedly inadequate is not sufficient to establish the right of another carrier to a certificate of convenience and necessity unless it further appears that there is a public necessity for the additional service.
Miller Transporters, Inc. v. Louisiana Public Service Commission, 518 So.2d 1018, 1019-1020 (La.1988); (citations omitted); See also CTS Enterprises, Inc. v. Louisiana Public Service Commission, 540 So.2d 275 (La.1989). Thus, an applicant for an additional certificate has a dual burden: (A) He must prove that the service he offers is required by public convenience and necessity by showing that: (1) his proposed operation will serve a useful public purpose for which there is a public demand or need; (2) this public purpose cannot and will not be served as well by existing carriers; and (3) applicant can serve this purpose with his new operation without endangering or impairing the operations of existing carriers contrary to the public interest, and (B) he must also show clearly that his proposed new operation will materially promote the public convenience and necessity. Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Commission, 549 So.2d 850 (La.1989).
Upon judicial review, the findings of the PSC on whether the applicant has made the necessary showing are accorded great weight and will not be overturned unless the finding is based on an error of law or is one which the PSC could not have reasonably made from the evidence. Miller Transporters, Inc. v. Louisiana Public Service Commission, 518 So.2d 1018 (La. 1988). The PSC's order is arbitrary and capricious only when the record does not and could not reasonably support its finding. Ken-Go Services, Inc. v. Louisiana Public Service Commission, 483 So.2d 141, 142 (La.1986).
*715 At the outset of the present case MCX established that it was fit, willing and able to provide a new service in the transportation of liquid and dry chemicals in a safe and financially feasible manner. The company is already operating in Louisiana under a federal interstate permit and a Louisiana intrastate contract carrier permit, employing 154 persons with annual payroll of approximately $2,750,000. The company has over 82 tractors and 125 trailers in Louisiana and has the financial means to acquire additional terminals, equipment and employees should the need arise. In its fleet are specialty chemical tank trailers, including chlorobutyl-lined, phenolic-lined, heat-in-transit, rubber-lined, triaxle and three-compartment trailers, many of which are presently unavailable from the existing carriers to meet the current demands of shippers.
MCX conducts comprehensive driving programs for its employees and also tests its employees for drug usage. Each driver is assigned to one product and one shipper. MCX also has the equipment for and personnel specially trained in the transportation of hazardous materials. The company has an environmentalist on its staff to further its emergency environmental response programs in spill management and clean-up procedures.
The PSC accordingly found that MCX is competent to serve the public by handling liquid and dry chemical commodities as requested in its restricted application.[2]
MCX presented eight shipper witnesses to prove the need for its proposed operation and the inadequacy of the existing carriers to meet the specialized and increasing demands of the shipping industry for handling bulk chemicals.
Wally Hopper of Georgia Pacific Corporation (GP), which requires 500 to 600 intrastate loads per week, stated his company reluctantly organized its own trucking operation because of the unavailability of dependable transportation services from the existing carriers. GP's transportation log for the week of May 20-26, 1990 revealed a shortage of motor carriers during one of its frequent plant shut downs, even though GP had given the existing carriers a two-week notice that additional trucks would be required to move seventy loads of paper process by-product per day from Port Hudson to Bogalusa. As a result, the company had to solicit interstate carriers (including MCX) to remove the by-product out of state, at an additional freight cost, in order to prevent the decreased plant production and the environmental problems that frequently result from failure to transport pulp mill liquors.
Martin Laffey of International Paper Company (IPC), which manufactures products used in paper production at plants and mills in north Louisiana and DeRidder, testified that IPC presently utilizes the services of existing'carriers, some of which are protestants. However, existing carriers are unable to meet IPC's needs for emergency transportation during planned and unplanned outages and interruptions in the manufacturing process. Twelve of these occurrences, which last from one week to six months, occurred in 1989. Laffey asserted MCX could assist in such situations when IPC has had to resort to more costly and less efficent rail and barge transportation because of the lack of carriers. IPC also conducts resin movements between Springhill and DeRidder, requiring specialized heat-in-transit equipment which is unavailable from the protesting carriers. MCX is the only carrier qualified to meet those requests.
William Blair of Georgia Gulf (GG) testified his company requires rubber-lined trailers for intraplant transfer of aromatic chemicals and electrochemicals and stainless steel insulated carriers for handling phenol, a temperate sensitive product which is poisonous and requires specialized handling. Blair acknowledged the existing carriers often do not have the necessary specialty equipment available to accommodate GG's load demands when required. GG also mandates that carriers load at its facility between the hours of 6:00 a.m. and *716 2:00 p.m., because after-hours loading is at a premium cost which often causes the loss of business. Existing carriers have been unable to meet these scheduling requirements for "load and go" shipments, which he expects to increase. GG also wants to phase out its rail fleet in favor of less expensive truck transportation. Blair stated MCX has always provided experience, cooperation and reasonable rates in meeting GG's special needs.
Phillip Cupertino of Rhone Poulenc (RP), a manufacturer of sulfuric acid, testified MCX has provided excellent service for twenty years under a contract permit servicing more than sixty destinations in Louisiana. MCX handles approximately ninety-five percent of RP's loads as a contract carrier, while Matlack, Groendyke, and another non-protestant carrier serve the remaining five percent. RP solicited MCX's services when Matlack requested a thirty percent rate increase to continue hauling out of Springhill. RP prefers using MCX because it was properly equipped and sufficiently knowledgeable to meet RP's product needs. MCX stationed drivers and equipment in RP's plants in Springhill and Bastrop, and no other carrier has a terminal in north Louisiana. Further, only MCX has the equipment to handle sulfur dioxcide loads, and RP makes 100 shipments per week. RP also had a new plant coming on line at the end of the year.
David Ehlers of Witco Corporation, a chemical manufacturer who requires rubber-lined three-compartment trailers for transporting oleum to Witco's plant as its feed stock and spent acid away as discharge, testified that only MCX provides these trailers, Matlack and Groendyke having discontinued service to Witco several years ago. Witco's loading rack was specially designed to accommodate MCX's equipment. Ehlers noted Witco's interest in the certification of MCX because of MCX's present contract with RP, who supplies Witco's feed stock handled by MCX under its contract carrier permit. A consistent volume of loads is necessary for MCX to keep servicing, and without MCX, Witco will be without a carrier to meet its specialized feed stock and discharge needs.
Robert Evans of Pioneer Chlor-Alkalai (PCA), a manufacturer of chemicals used to make caustic soda and chlorine, stated that MCX presently carries PCA's interstate loads and had transported intrastate loads from the plant as a contract carrier for over twenty years until PCA bought the plant from RP.[3] Evans averred that the certification would allow PCA to renew the previous relationship with MCX, thereby allowing PCA to benefit from a company already familiar with its demands. Evans noted that Groendyke, who presently hauls for PCA, would lose some business, but this loss would be offset by the anticipated increase in production of caustic products, for which there is a great demand.
Lynn Landry of Jones Chemical, which is the largest manufacturer of sodium hypochlorite (bleach), testified that the product must be transported in rubber-lined tankers. After use the trailers require a detailed cleaning process in order to meet environmental concerns and customer satisfaction. Jones, like Georgia Gulf, reluctantly had to enter the transportation business because the existing carriers were unable or unwilling to provide the rubber-lined trailers necessary to meet customer demands. Specific dates between April and June of 1990 were documented when Jones contacted several existing carriers to haul bleach from Reserve to Bastrop, but no equipment was available. Jones' own tanker is unable to meet the need, causing delays in deliveries. Jones does not desire to add additional tankers to its fleet and would abandon its transportation operation if MCX is granted a certificate.
Claude Davis of Formosa Plastics Corporation (FPC), a manufacturer of caustic soda, testified that MCX, in addition to several of the protestants, presently hauls intrastate and interstate for FPC. MCX has provided commendable and prompt service, *717 and only MCX provides triaxle trailers which FPC prefers to utilize. However, Davis verified FPC would also continue to use the existing carriers should MCX become certified as a common carrier, because its volume has tripled in three years following plant expansion and switching from rail and barge to truck transportation. A new plant is currently under construction.
Anticipated new business, another factor in the determination of significant public need, was also addressed by the supporting witnesses. Their testimony established that the transportation by motor carrier of chemicals, unlike the transportation of oil and gas, is increasing because of construction of new plants and expansion of existing plants, as well as the shifting from rail and barge transportation. IPC has been forced to rely on rail and barge services to meet their customer demands, but would prefer quicker and cheaper motor transportation. GG also has a rail fleet which it wishes to phase out, and the streamlining and increasing of capacity of caustic soda production, along with the construction of new facilities, is expected to increase GG's chemical truck needs. RP's new phosphoric acid plant will generate more tank truck movements. RP will also increase its motor carrier transportation usage indirectly through Witco's recent plant expansion which is expected to create a thirty percent increase in oleum consumption and spent acid discharge to be hauled in rubber-lined trailers provided only by MCX. Jones Chemical has been experiencing a substantial growth because of increased demand and is in the process of tripling its annual production of bleach in response to the shift from chlorine, which is more expensive and less environmentally safe. Formosa is expanding its Baton Rouge plant and constructing a new plant at Batchelor, which will generate twenty new loads per day for carriers. PCA streamlined its plant operations which has resulted in a ten percent increase in caustic soda production.
Based on this evidence, the PSC found that MCX had proved a significant public need for the additional common carrier authority, as restrictively requested, and the corresponding inadequacy of existing carrier service to meet the reasonable needs and the specialized demands of the shippers. The PSC also found that MCX proved an anticipated future increase in the demand for motor carrier services to transport chemical commodities. These findings are supported by the record.
The protestants argue that even if MCX has successfully proved its operation is responsive to the public need which the existing carriers can not or will not serve, the certification of MCX will result in a detrimental loss of business to them and should be denied. None of the supporting shippers testified that they would take business away from any of the protestants. The PSC found that the benefits to shippers outweighed the harm to existing carriers. MCX's certification as a bulk chemical carrier will not impact Matlack, DSI or Montgomery in their operations involving transportation of petroleum products. L & B, which has focused on transportation of chemicals, had almost no idle equipment at the time of the hearing. We conclude that the record supports the PSC's finding that the shippers in the chemical industry can support another motor carrier without significantly affecting the operations of the existing carriers contrary to the public interest, and in any event the benefits outweigh the harm.
Finally, we agree with the PSC's finding that MCX clearly showed that its proposed operation will materially promote public convenience and necessity, particularly because of the availability of its specialized equipment necessary to service adequately and quickly the expanding demands of the shippers. Additionally, MCX's terminal in North Louisiana will provide needed motor carrier presence there, and MCX's excellent equipment, design services and trained personnel will benefit shippers statewide. Finally, several shippers who are reluctantly providing some of their own transportation will be able to abandon that operation.
We conclude the PSC did not act arbitrarily or capriciously in granting MCX an intrastate common carrier certificate for *718 transporting chemicals. The record clearly establishes that MCX has presented sufficient evidence from which the PSC could reasonably conclude there had been a clear showing that public convenience and necessity would be materially promoted by MCX's providing competent and specialized services in the flourishing chemical industry which existing carriers cannot or will not provide.
For the foregoing reasons, the judgment of the district court is affirmed.
DENNIS, J., dissents with reasons.
COLE, J., respectfully dissents.
DENNIS, Justice, dissenting.
I respectfully dissent. I believe that Mississippi Chemical Express, Inc. ("MCX"), has failed to clearly show that the public convenience and necessity is materially promoted by the issuance of the certificate. La.R.S. 45:164. The witnesses in support of MCX's application reveal that there are very specialized needs of a few individuals which are not being met; this does not satisfy the requirement that public convenience and necessity be met. Miller Transporters, Inc. v. Louisiana Public Service Commission, 518 So.2d 1018, 1019 (La.1988). Further, many of the witnesses testified that they did not use all of the available carriers currently licensed; in fact, several testified that they were not aware that the protesting carriers were even authorized by the Commission. Accordingly, giving all proper deference to the Commission's findings, Miller, supra, at 1020, I cannot say that the Commission could have reasonably found that MCX had clearly shown that the public convenience and necessity is materially promoted by the issuance of the certificate.
For these reasons, I respectfully dissent.
NOTES
[1] The protests of Miller Transporters, Inc. and Groendyke Transport, Inc. were dismissed by the PSC as being untimely filed.
[2] The PSC noted that MCX's payment of a fine in settlement of allegations of numerous violations of the Louisiana Motor Carrier Act did not alone warrant a finding of non-fitness.
[3] MCX could not legally serve the plant after the sale to PCA because a contract carrier can only serve five shippers.