GUIDRY, Justice.
11 This appeal raises the issue of whether the Louisiana Public Service Commission (hereinafter, “Commission”) acted arbitrarily or capriciously when it granted Southern Specialties Transportation, L.L.C. (hereinafter, “Southern”) a limited and restricted common carrier certificate authorizing the transportation of drilling mud for disposal originating in only six named parishes, with additional restrictions specifically prohibiting transportation by dump truck of non-hazardous solid waste originating in three other named parishes. On appeal to the 19th Judicial District Court pursuant to La.Rev.Stat. 45:1192, the district court rescinded the Commission’s Order No. T-29541. Thereafter, the Commission and Southern appealed directly to this court pursuant to La. Const, art. IV, § 21 (1974). After reviewing the record of the evidence in this case and the applicable law, we conclude the Commission’s determination that Southern met its burden of showing public necessity and convenience in its application for a limited and restricted common carrier certificate was not arbitrary and capricious and is reasonably supported by the evidence. Because we find the district court erred in substituting its judgment for that of the Commission, we reverse the district court’s ruling and reinstate the Commission’s Order No. T-29541.
| .BACKGROUND FACTS AND PROCEDURAL HISTORY
On May 8, 2006, Southern filed an application for a common carrier certificate au *935 thorizing transportation of drilling mud for disposal, statewide. The application was published in the Commission’s Official Bulletin on May 10, 2006. During the publication period, the Commission received notices of opposition on behalf of Vacuum Truck Carriers of Louisiana, Inc. (hereinafter, “Vacuum Truck Carriers”), Vanguard Vacuum Trucks, Inc. (hereinafter, “Vanguard”), and Stranco, Inc. (hereinafter, “Stranco”). The Commission also received a formal protest on behalf of Scion-eaux, Inc. (hereinafter, “Scioneaux”). Protestants are holders of common carrier certificates interested in protecting their operating rights.
A hearing before the Commission was continued several times, with counsel for the applicant Southern stating in one motion that the applicant and the protestants were negotiating to resolve their differences. In the meantime, Vanguard in July 2006 withdrew its opposition to Southern’s application. In August 2006, Southern filed a restrictive amendment to its application, which action resulted in the withdrawal of Scioneaux’s protest. Accepted by the Commission, the restrictive amendment provides as follows:
Restricted against the transportation by dump trucks of regulated non-hazardous solid waste originating in the parishes of St. John the Baptist, St. Charles and St. James. This restriction is applicable only to the transportation of non-hazardous solid waste in dump trucks.
In September 2006, Stranco also withdrew its opposition to Southern’s application.
A hearing was conducted on October 3, 2006, before an administrative law judge (hereinafter, “ALJ”). After Southern filed an exception to the ALJ’s draft recommendation, the ALJ issued a final recommendation to the Commission on February 23, 2007, in the form of a draft order. The proposed order found that, |saIthough there are times when the shippers’ needs are not being met on demand, the applicant did not prove as required by La.Rev. Stat. 45:164 that public convenience and necessity required the issuance of a certificate. The Commission in its business and executive session of May 24, 2007, voted, with the exception of one member, to reject the ALJ’s final recommendation and to grant Southern a limited and restricted common carrier certificate authorizing the transportation of drilling mud for disposal, which originates in the parishes of Acadia, Evangeline, St. Landry, Jefferson Davis, Vermillion, and Cameron, with the following restrictions or limitation:
Restricted against the transportation by dump trucks of regulated non-hazardous solid waste originating in the parishes of St. John the Baptist, St. Charles and St. James. This restriction is applicable only to the transportation of non-hazardous solid waste in dump trucks.
On October 3, 2007, the Commission initially issued its Order No. T-29541 reflecting that decision, but it subsequently reissued the order on November 26, 2007, “merely to correct the name of the applicant.” LPSC Order T29541, November 26, 2007, p. 1, n. 1. Pursuant to La.Rev. Stat. 45:1192, the protestant appealed the Commission’s Order No, T-29541 to the 19th Judicial District Court, which issued an opinion rescinding the Commission’s order. The Commission and Southern now appeal that ruling to this court under La. Const, art. IV, § 21 (1974).
LAW and STANDARD OF REVIEW
Under Louisiana law, a motor carrier may not operate as a common carrier without first obtaining from the Commission a certificate of public convenience and necessity, which shall be issued only after a written application is made, a public hearing conducted, due notice given to the *936 applicant and all competing common carriers, and a finding by the Commission that public convenience and necessity require the issuance of a certificate. La.Rev.Stat. 45:164. Furthermore, no new or hadditional certificate will be granted over a route where the Commission has previously issued a certificate, unless it is clearly shown that the public convenience and necessity would be materially promoted thereby. Id.
Given the focus on public convenience and necessity, that concept has been the subject of much litigation and discussion. See, e.g., Matlack, Inc. v. Louisiana Public Service Comm’n, 622 So.2d 640 (La. 1993). Consequently, it is well-settled that public convenience and necessity is a dynamic and flexible concept, which is not susceptible to a rigid or precise definition and, therefore, must be determined on a case-by-case basis. Louisiana Household Goods Carriers v. La. Public Service Comm’n, 00-2803, p. 4 (La.3/12/01), 781 So.2d 545, 547; Matlack, Inc., 622 So.2d at 650; Florane v. Lousiana Public Service Comm’n, 433 So.2d 120, 123 (La.1983). Among the factors that may be considered in determining public convenience and necessity are whether the new operation or service will serve a useful public purpose responsive to public demand or need, whether this purpose can and will be served as well by existing carriers, whether it can be served by the applicant’s operation without endangering or impairing operations of existing carriers contrary to public interest, and whether it can be served by the applicant without undue jeopardy to highway users or to the structure and safety of the roads. Miller Transporters, Inc. v. Louisiana Public Service Comm’n, 518 So.2d 1018, 1019-20 (La.1988)(collecting cases and authorities); see also Matlack, Inc., 622 So.2d at 655-56 (citing L & B Transp. Co. v. Louisiana Public Service Comm’n, 602 So.2d 712, 714 (La.1992); Gulf Coast Pre-Mix Trucking v. Louisiana Public Service Comm’n, 336 So.2d 849, 854 (La.1976)).
Evaluating whether an applicant meets the requisite burden of proving public convenience and necessity is within the Commission’s sound judgment and | discretion. Mississippi Chem. Exp., Inc. v. Louisiana Public Service Comm’n, 94-0440, p. 7 (La.5/23/94), 637 So.2d 93, 98; Matlack, Inc., 622 So.2d at 650. The Commission’s determination is accorded great weight because it is an exercise of the Commission’s discretionary authority. Mississippi. Chem. Exp., Inc., 94-0440 at p. 7, 637 So.2d 93, 98; Florane, 433 So.2d at 123; Dreher Contracting & Equip. Rental, Inc. v. Louisiana Public Service Comm’n, 396 So.2d 1265, 1267 (La.1981)). Indeed, “[t]he general rule is that a regulatory body may use its own judgment in evaluating evidence as to a matter within its own expertise.... ” Louisiana Household Goods Carriers, 00-2803, p. 4, 781 So.2d at 548; Baton Rouge Water Works Co. v. Louisiana Public Service Comm’n, 342 So.2d 609, 611 (La.1977). The determinations made by the Commission are presumed valid; therefore, the party who attacks the Commission’s determination has the burden of proving its invalidity. Louisiana Household Goods Carriers, 00-2803, p. 4, 781 So.2d at 548; Baton Rouge Water Works Co., 342 So.2d at 611; Louisiana Oilfield Carriers Ass’n v. Louisiana Public Service Comm’n, 281 So.2d 698, 700 (La.1973).
A reviewing court may not overturn the Commission’s determination of public convenience and necessity unless the determination is based on an error of law, or unless it is arbitrary or capricious. Louisiana Household Goods Carriers, 00-2803, p. 4, 781 So.2d at 548; Baton Rouge Water Works Co., 342 So.2d at 611; Miller *937 Transporters, Inc. v. Louisiana Public Service Comm’n, 518 So.2d 1018, 1020 (La. 1988). The Commission’s determination “is arbitrary and capricious only when the evidence in the record does not and could not reasonably support it.” Mississippi Chem. Exp., 94-0440 at p. 7-8, 687 So.2d at 98. When reviewing the Commission’s determinations, the reviewing court should not re-weigh the evidence or re-judge the credibility of the witnesses or substitute its findings for those of the Commission. | rLouisiana Household Goods Carriers, 00-2803, pp. 4-5, 781 So.2d at 548; Louisiana Household Goods Carrier v. Louisiana Public Service Comm’n, 99-3184, pp. 3-4, 762 So.2d 1081, 1085; Mississippi Chem. Exp., 94-0440 at p. 7-8, 637 So.2d at 98. Instead, reasonable inferences of fact and of credibility made by the Commission should not be overturned on review, even though the reviewing court may reasonably disagree. Id. Accordingly, the court’s role in judicially reviewing the Commission’s determination of public convenience and necessity is “ ‘quite narrow: if the Commission’s determination is reasonably supported by evidence in the record, [the court] must affirm.’ ” Louisiana Household Goods Carriers, 99-3184, p. 4, 762 So.2d at 1085-86 (quoting Mississippi Chem. Exp., 94-0440 at p. 8, 637 So.2d at 99); see also Scotty’s Vacuum Serv., Inc. v. Louisiana Public Service Comm’n, 450 So.2d 1303, 1304 (La.1984); B&M Trucking, Inc. v. Louisiana Public Service Comm’n, 353 So.2d 1323, 1328 (La.1977).
DISCUSSION AND ANALYSIS
In this case, we must determine whether the Commission, acting reasonably on the evidence in the record before it, could have determined that issuing Southern a limited and restricted common carrier certificate, which gave it limited authority to transport only drilling mud for disposal originating in six named parishes, with additional restrictive amendments, would materially promote the public convenience and necessity. If the Commission’s issuance of the limited and restricted common carrier certificate action is reasonably supported by the evidence, and is not arbitrary and capricious, then we must reverse the district court’s ruling rescinding the Commission’s order.
To determine whether the Commission’s order is reasonably supported by the record evidence, a comprehensive review of the testimony at the hearing before the |7administrative law judge is necessary. Louisiana Household Goods Carriers, 99-3184, p. 4, 762 So.2d at 1086 (citing Ken-Go Services, Inc. v. Louisiana Public Service Comm’n, 483 So.2d 141, 143 (La. 1986)).
Southern’s Case
At the 2006 hearing, Jonathan Kent Col-ligan testified that he is the owner of Southern, which had then been in existence for six months and operating for two months hauling drilling fluids, new mud from plant to rig to storage, both freshwater and saltwater, for which the applicant already had authority from the Commission. The company, located along with its terminal in Church Point, Louisiana, has two trucks, both of which are insured and one of which Colligan operates himself. Colligan is personally HAZMAT certified; there are two employees. The applicant has transported saltwater for a number of customers. Colligan testified that he has received numerous requests to do work outside of the saltwater transporting and has had to turn down jobs as a result of not having the authority the company is presently seeking. Colligan testified that, should the requested authority be granted, the company is prepared to begin operation under the new authority immediately.
*938 On cross-examination by counsel for the protestants, Colligan testified that, although he had not performed any research or surveys, he sees a need for the requested authority based on the business the company has turned down. Colligan further testified that he has never hauled as a lease operator or other operator under another certified carrier’s authority. He testified the company’s two trucks both hold standard vacuum equipment and the company, which is audited through the state Department of Transportation, has in place safety programs and procedures.
The applicant’s second witness was Stephen Edward Daigle, who had then been employed over the previous seven years as a dispatcher and logistics coordinator [sfor Francis Drilling Fluids (hereinafter, “FDF”) in Crowley, Louisiana. He testified that he handles all customer requests for any type of oilfield services dealing with vacuum truck transportation, transportation of liquid mud and drilling fluids, and hauling materials. He explained that FDF has a Master Service Agreement (hereinafter, “MSA”) with at least eighteen trucking companies, primarily to ensure adequate insurance coverage. FDF utilizes companies on this list to fulfill their customers’ liquid transportation requests. He stated that FDF pays the trucking company’s bill and then bills out the balance to the customers. Daigle testified that, when a call is received by FDF requesting a vacuum truck to transport some form of liquid, he will usually go up and down the list at least twice, and sometimes more often, during his twelve-hour shift. Daigle testified that even going up and down the list twice or more, he sometimes still does not find enough trucks to handle the work FDF has coming in. In support of that testimony, applicant introduced FDF’s daily call log, which Daigle explained represents only 20% to 30% of the calls actually received because of time and manpower limitations; the log thus represents important requests and some of FDF’s main customers. These logs, Dai-gle testified, display instances when FDF was unable to obtain the number of trucks needed. When this happens, FDF usually has to wait until the next day to obtain a vacuum truck based on a requirement that trucks can only run a rough estimate of 14-hour days, thereafter followed by a 10-hour break. Daigle testified to a number of documented occurrences in which a customer called to request a vacuum truck but FDF was unable to locate an unoccupied truck.
Daigle testified that not being able to locate a truck timely creates a problem because a number of the customers need to remove the waste fluid from the site due to limited space issues. Daigle further testified that, on occasion, customers Jjjthemselves would call some of the trucking companies listed on the MSA. Daigle testified that a number of customers are oil companies that cannot wait until the next day for proper clean-up. He stated that, generally, unless FDF is given 12 to 24-hour notice from the requesting customer, there are not enough trucks to fulfill the customers’ requests. Applicant’s Exhibit No. 2 consists of log notes from a recent period prior to the hearing, roughly 7/27/06 to 9/14/06. While reading excerpts from those logs, Daigle identified seven incidents in which FDF was unable to locate one or more available trucks for use, some of which placed the oil company and drilling company customers in a bind. However, Daigle reiterated that there are numerous more incidents in which FDF was not able to acquire a vacuum truck from outside companies, even though time or manpower issues prevented those instances from being thoroughly logged in. He explained that many of the oil company and drilling company customers call at the *939 last minute and, therefore, they cannot wait until the next day; consequently, he stated, unless the customers give advance notice, there are not enough trucks to meet customer demand. Daigle stated that volume was such that FDF could probably keep all the carriers’ trucks running everyday if the trucking companies had a truck available. Daigle testified that FDF supported Southern’s application.
On cross-examination, Daigle explained how FDF bills customers and pays the trucking companies. When asked by prot-estante counsel if FDF is a shipper, Dai-gle answered affirmatively. Daigle also testified that FDF has its own carrier authority from the Commission. Essentially, Daigle explained that FDF acts as the “company man” for the oil company, by handling all the shipping logistics. Daigle also explained that the MSA lists “pretty much” all the vendors in the area, and once that list is exhausted, there is “really nobody left to call,” unless he called carriers from | inTexas, resulting in higher costs to the customer. Although Daigle had not called the Commission for a list of carriers in that area, he stated that carriers usually contacted FDF and that, from his knowledge, there were no other trucking companies not on the list. Daigle also explained that FDF ultimately had the responsibility for getting the waste product hauled away, and the requests that could not be immediately satisfied, were generally completed in 12 to 24 hours. FDF itself often does not have enough trucks, Daigle testified, but when asked if that was the nature of the business, Daigle explained that, while it could be, many of the new drilling locations were restricted sites that run a closed loop system, meaning that everything that is hauled in must be hauled out because there is no pit system. Daigle stated there is a need for additional carriers in that area with the authority to haul waste, especially when a carrier enters a location with new product but cannot haul out the waste product because that carrier lacks the authority to do so. Calling another truck to haul the waste out creates problems, too, because the drilling locations have limited room and more trucks on one location at a timé is inconvenient for the customer. Daigle explained that, once the fluid is taken to the site, eventually it has to be hauled away; thus, about half the calls received by FDF are for disposal.
Protestant’s Case
Vacuum Truck Carriers was the remaining opponent of the application at the time of the 2006 hearing. Troy Yonker, the owner of Pride Oilfield Services, a vacuum truck service out of Benton, Louisiana, testified that his Commission authority is restricted to the northern part of Louisiana. He stated that he is familiar with the MSA and that Pride Oilfield holds a saltwater certificate from the Commission. Mr. Yonker stated he is against statewide authority for Southern, because such authority would enable it to serve north Louisiana as well. Yonker |nstated that Pride Oilfield had applied for and been denied statewide authority and that, had it been granted statewide authority, Pride Oilfield could, and should be allowed to, provide service to FDF if there are more trucks needed. He stated his company, which has safety programs in place and carries liability insurance, is adding new equipment and could always use additional business. Pride Oilfield, whose terminal is located in Haughton, Louisiana, has eleven tractors and twelve tankers. Yonker stated that there is nothing unique or special about Southern’s equipment, in his view, but agreed there is a possibility he would be willing to lease Southern’s trucks if it wanted to operate in Pride Oilfield’s area. To laughter in the hearing room, he added that he hopefully would see counsel later *940 for a statewide permit “to accommodate these guys down south.” On cross-examination, Yonker testified that the geographical cut-off line for Pride Oilfield’s authority was just south of Alexandria, Louisiana, and that his company does not have authority to transport regulated waste below its authority marker.
Crystal Miers, employed by Louisiana Tank of Church Point, Louisiana, testified that she is responsible for sales and dispatching. Louisiana Tank, which has a certificate of liability insurance and safety programs in place, has statewide authority to transport drilling fluids for disposal; its main terminal is located in Lake Charles, Louisiana (37 units), with additional terminals in Church Point (5 units), Fourchon (18 units), and Pitkin (2 units). Miers testified that Louisiana Tank, which currently provides services to FDF, could use more business and revenue. She testified that Louisiana Tank would be willing to step up their service if the need were there and that they periodically acquire new equipment as the needs of the shipping public arise. Louisiana Tank opposed the application because, Miers explained, there are always instances when trucks cannot be found, but that it is not everyday that they | ^are turning down business, as Louisiana Tank had idle trucks the week of the hearing.
On cross-examination, Miers conceded that Louisiana Tank leases the Fourchon and Pitkin terminals, and their units, from other trucking companies. She explained that all of Louisiana Tank’s trucks consist of owner/operators that are leased to them in each terminal they have, because it is easier than having company employees. She admitted that these owner/operators could stop working for the company at any time. As to Daigle’s testimony, Miers agreed that there are times when Louisiana Tank has turned down requests from FDF, but on re-direct, she stated that the number of requests turned down is smaller than the number of requests accepted.
Kenneth Bourque, the owner of Bourque Vacuum Service, Inc., in Duson, Louisiana, testified that his company has held statewide authority from the Commission for 21 years. The company has a safety program, possesses a certificate of liability insurance, as required by most MSAs, owns eight trucks, and leases two more. Bourque testified that his company provides service to FDF through the MSA, business that is important to his company. Bourque stated that, if the applicant is granted authority, it would be detrimental to his company because FDF would be calling the applicant instead of him. As to Daigle’s testimony, Bourque admitted there are some instances when there are not enough trucks to fulfill the requests of its customers; he estimated he is unable to provide service one or two percent of the time. Bourque testified that he has the financial wherewithal to acquire new trucks, but even if he acquired ten new trucks, there would be times when he would be unable to provide service to shippers, explaining that the business is cyclical and “runs in spurts.” He agreed he would be willing to lease authority to additional owner/operators if he saw the demand, and added that he would be willing to take on | ^Southern’s trucks immediately under his company’s own authority: “Yeah, I’d lease them on now. If they want to come lease, it wouldn’t be no problem.” On cross-examination, Bourque stated that the owner/operators leased under his authority receive a percentage of the revenue only when they do work for Bourque Vacuum Service, Inc. When asked whether Southern would ever be called on to perform work and receive revenue if leased under Bourque’s authority, Bourque stated, “That wouldn’t be a problem. There’d be plenty of work.”
*941 Public Need or Demand
We first find that the evidence reasonably supports a determination that there is a public need or demand for Southern’s proposed operation. A prima facie case of public need or demand requires that the applicant, through competent evidence, must establish with specific facts, rather than general, conclusory statements, that the service under the authority sought is needed and that such service is not otherwise available. Mat-lack, Inc., 622 So.2d at 656-657. Daigle, whose company is not only a carrier with its own authority from the Commission, but also a shipper who additionally contracts with vacuum truck companies on behalf of other shippers, testified with a supporting exhibit consisting of current log entries that his company has been unable to secure transportation of drilling fluids for disposal on numerous occasions.[1] Though only seven denials of service were logged in within a period of less than two months, Daigle testified there were numerous instances when trucks [14were not available that were not logged in and that the logs represented only about 20 to 30% of these calls. Thus, his testimony and the supporting evidence, if accepted by the Commission, reasonably established that 23 to 35 calls for service were not timely satisfied over the time period for which he produced log excerpts. But Daigle’s testimony regarding unmet disposal service requests was further bolstered by the testimony of the protestant’s witnesses, Miers and Bourque, who both agreed that their companies have had to turn down service requests from FDF. Though they explained those refusals as few and the result of cyclical demand, that testimony supports applicant’s case that there is a public need or demand for his proposed operation. The protestant’s only other witness, Yonker, could not testify as to public demand or need, or lack thereof, south of Alexandria. Additionally, through Daigle’s testimony, Southern established that an important aspect of the modern oil drilling industry was quick and timely removal of waste drilling fluids from the drilling location, because those locations are restricted in size and operate with closed-loop systems. Thus, his testimony establishes not only that shippers’ requests for service are not being met, but also why such requests for timely service are critical to the shippers’ operations.
Inadequacy of Existing Carrier Service
In that vein, the evidence and testimony in the record also reasonably supports a determination that the available transportation service is inadequate in that existing carriers are either incapable or unwilling to handle a specific shipping need in a reasonably satisfactory manner. To meet its burden of establishing the inadequacy of existing carrier service, the *942 applicant must demonstrate that shippers have attempted and failed to obtain service or that service, when obtained, was deficient. Matlack, Inc., 622 So.2d at 658. The applicant must affirmatively show a need for ^service based on “a consistent and recurring inability to secure adequate and satisfactory service from existing carriers.” Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Comm’n, 549 So.2d 850, 857 (La.1989).
Daigle’s testimony, coupled with the log entries and the admissions of Miers and Bourque, reasonably supports a finding that shippers repeated attempts to obtain timely drilling waste removal service have failed. Daigle testified that the MSA used by FDF consists of nearly all, if not all, of the available trucking companies with the authority to operate in that part of the state. He stated that he would perhaps have to resort to non-Louisiana carriers to meet the needs of the customers. As set forth above, his testimony and the log exhibit show drilling mud disposal requests are presently not being met, and that timely satisfaction of those requests is now critical to the oil industry. Thus, while the evidence shows that the service requests may ultimately be satisfied within 12 to 24 hours of the request, Daigle explained why even such a seemingly minimal delay is unsatisfactory to FDF and the oil and drilling companies which FDF serves. Nothing in the record contradicts that testimony; therefore, given that the Commission obviously accepted his testimony, it could reasonably have found that current service providers are not meeting shippers’ particular service requests, and even when current operators eventually do respond to those requests, the service supplied does not adequately satisfy the shippers’ need for more timely removal of the drilling waste from the drilling location. Both Miers and Bourque testified that their companies would be willing and able to acquire more trucks, likely through lease agreements with new owner/operators, if they perceived a rise in demand. However, their testimony was arguably contradicted by their own admissions that service requests are currently and routinely being turned down, and yet neither witness testified that their companies are presently planning to acquire any 11fimore trucks to meet those current needs. Yonker testified that his company would be willing and able to supply some of the services needed “to accommodate those guys down south,” but only if he were granted statewide authority from the Commission, an authority he currently does not have. Accordingly, we cannot say the evidence in the record fails to support a finding of inadequacy of existing carrier service.
Effect on Existing Carriers
Next, we find the Commission, on the evidence before it, could have reasonably concluded that advantages to the shipping public outweigh the actual or potential disadvantages to the existing carriers if the requested authority is granted. Even when an applicant successfully shows that its proposed new operation will serve a public need or demand that existing carriers could not or would not serve, the applicant must still show that the advantages to the shipping public (shippers’ needs for the new service) outweigh the actual or potential disadvantages to the existing carriers (adequacy of existing carrier service) that may result from granting the certificate. Matlack, Inc., 622 So.2d at 660. While a grant of additional authority that allows a new competitor to enter a market already served by existing carriers could and perhaps will result in adverse affects on those carriers, existing carriers have a basis for complaining only if the added service is not in the public interest. Matlack, Inc., 622 So.2d at 660 (citing Hilt *943 Truck Line, Inc. v. United States, 532 F.2d 1199, 1203 (8th Cir.1976)).
Here, the Commission could have reasonably concluded that the addition of Southern as a carrier of drilling waste for disposal — in a limited geographical area and with additional restrictions — would result in sufficient improvement in existing service to shippers to justify the potential costs to existing carriers. Daigle’s testimony reasonably demonstrates that there would be verifiable advantages to 117shippers of drilling waste for removal if Southern’s limited authority were granted. Given the testimony of both Daigle and Bourque that there was plenty of work to go around and given that the testimony of both Miers and Bourque suggested that peak demands would still not be met if more trucks were added, the Commission could have reasonably found that the potential negative effects on existing carriers would not outweigh the established advantages to the shippers. The Commission could have reasoned on this evidence that depriving the existing carriers of traffic they are authorized to transport by adding a new competitive service would not result in needlessly duplicative transportation services or significantly prevent existing carriers from operating at full capacity. See Matlack, Inc., 622 So.2d at 660-61. Moreover, it is significant that the Commission limited and restricted the authority it granted to Southern to a specific and delineated geographical area, effectively denying, at least in part, Southern’s request for statewide authority. Given that the Commission is certainly aware of the importance of the drilling industry to Louisiana and its citizens, and given that the Commission intentionally limited and restricted the authority it granted to Southern, the Commission could have reasonably found on the record evidence that the public interest would be materially promoted by granting the application in the manner and to the extent it did.
CONCLUSION
Mindful that our role in reviewing the determinations of the Commission is not to sit as a super-Commission assessing the credibility of the witnesses and weighing the evidence, we cannot say that the Commission acted arbitrarily or capriciously in granting Southern the limited and restricted authority to transport drilling mud for disposal originating in six named parishes, with additional restrictions specifically prohibiting transportation by dump truck of non-hazardous solid waste originating in 118three other named parishes. While under La.Rev.Stat. 45:164 the applicant must clearly show that public convenience and necessity would be materially promoted by the issuance of the requested common carrier certificate, the burden is on the protestant to show that the Commission’s order granting that certificate is invalid, Louisiana Household Goods Carriers, 00-2803, p. 4, 781 So.2d at 548, and the protestant here has not established that the Commission made an error of law or that its factual findings are not reasonably supported by the evidence in the record. Whether this court might have reached a different result is not the standard of our review; instead, we are called upon to determine only if there is sufficient evidence in the record that would reasonably support the factual findings of the Commission. Because we cannot say those findings are unreasonable on this record, we find the district court erred in concluding otherwise and in reversing the Commission’s order. Accordingly, we reverse the district court’s ruling rescinding the Commission’s Order No. T-29541 and reinstate that order.
DECREE
For the reasons expressed above, the judgment of the district court, rescinding *944 the Commission’s Order No. T-29541 granting Southern a common carrier cer-tifícate with limited and restricted authority, is reversed, and the Commission’s ox*-der is reinstated. All costs of this appeal are assessed against the protestant, Vacuum Truck Cai'riers.
REVERSED; ORDER NO. T-29541 REINSTATED.

. Although the protestant asserts that Daigle is not a "shipper witness,” Daigle responded affirmatively to protestant counsel's question whether FDF is a shipper itself. The protestant has pointed to nothing in the record that would contradict Daigle's testimony. Further, although the protestant asserts at least five shipper witnesses must testify in favor of the applicant to show a sufficient need to support the request for statewide common carrier authority, as opposed to merely a contract carrier request, the protestant points to no jurisprudence from this court requiring a specific number of shipper witnesses. Additionally, we note that Daigle stated FDF was not only a shipper itself, but it also acted on behalf of a number of oil company and drilling company customers in securing transportation of drilling waste for disposal. Again, there is nothing in the record that has been brought to our attention that would contradict Daigle’s testimony in that regard. At any rate, as discussed infra, the Commission effectively denied in part statewide authority when it limited Southern's authority to a specific geographical area.